# EXHIBIT 1

**To the Arbitration Court of the City of Moscow**
17 Bolshaya Tulskaya Street, Moscow, 115191

Plaintiff: "VK" LLC
TIN: 7743001840, OGRN: 1027739850962
39 Leningradsky Prospekt, building 79, Moscow, 125167

Defendants: **1. Apple Inc.**
Registration number 806592
One Apple Park Way, Cupertino, California, 95014, USA

**2. Apple Distribution International Ltd.**
Registration number 470672
Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland T23 YK84, IE
**Apple Distribution International Limited representative office in Moscow**
TIN: 9909463443
4 Romanov Pereulok, building 2, floor 6, Arbat Municipal District, intracity territory of the city, Moscow, 125009

**3. "APPLE RUS" LLC**
TIN: 7707767220, OGRN: 5117746070019
4 Romanov Pereulok, building 2, floor 6, Premises II, Office 54, Moscow, 125009

State duty: 200,000.00 RUB

August 18, 2026

**Statement of Claim**
**on challenging a unilateral termination of a contract**
**and seeking the restoration of violated rights**

The plaintiff owns software (VK applications) distributed to users of Apple products via the App Store.

VK is the largest Russian technology company by number of users. Users of VK services account for 97% of the monthly audience of Runet (the Russian segment of the "Internet" network); that is, virtually all Internet users in Russia use the company's products.[1]

In the fourth quarter of 2025, the social network VKontakte had 93.4 million monthly users in Russia, the social network OK (Odnoklassniki) had 34 million monthly users, the information platform Dzen had 67 million users per quarter, VK Klipy had 3.1 billion average daily views, "Mail" services had 48.6 million monthly users, etc.[2]

The development and distribution of applications on the App Store are governed by the Apple Developer Program License Agreement (hereinafter referred to as the "License Agreement"; Appendix No. 2). "VK" LLC has entered into the License Agreement electronically by installing and using Apple software (Appendix No. 3).

[1] See VK's annual report for 2025 (Page 6 of the presentation, Appendix No. 1).
[2] See VK's annual report for 2025 (p. 16, 19, 28, 41 of the presentation).

The purpose of the License Agreement is to grant the company (the Plaintiff) the right to use Apple software to develop applications that run on Apple products (devices) (the "Purpose," Paragraph 2 of the License Agreement). Applications developed in this manner must comply with the requirements of Apple's technical documentation (Paragraph 3.3), obtain certification (Paragraph 5), and pass Apple's selection process for distribution via the App Store (Paragraph 6). The Company makes annual payments to Apple as consideration for the software license (Paragraph 8).

The terms governing the distribution of paid and free applications in the store are set forth in Appendices 1 and 2 to the License Agreement. Under these appendices, in the case of free applications (Appendix No. 1 to the License Agreement), the Company appoints Apple Inc. and its subsidiary (depending on the region where the applications are to be distributed) as a commission agent responsible for advertising, offering for sale, accepting orders, and facilitating end user access to the applications developed by the Company. In the case of paid applications (Appendix No. 2 to the License Agreement), the commission agent also undertakes to issue invoices, collect payments from end users, and remit such payments (minus its own commission) to the Company. For a more detailed description of the rights and obligations of the parties under the License Agreement, see Appendix No. 4.

In accordance with the License Agreement, to use Apple software and services for the purpose of developing and distributing applications, a developer creates an account (developer account) on the **Apple Developer Program** web platform at https://developer.apple.com, which provides access to key resources for application developers. Application development is carried out on this platform.

Developers are also granted access to the **App Store Connect** web platform at https://appstoreconnect.apple.com, which is used to manage developed applications, including their distribution to end users via the App Store. Access to this platform is obtained using a developer account.

Pursuant to the License Agreement for access to the Apple Developer Program and App Store Connect web platforms, an account was created for **"VK" LLC – user "VK LLC," ID: 4D6LAS85PP.**

The following applications, approved for distribution on the App Store, were registered to "VK" LLC:

**VK:** social network, messenger (Apple ID 564177498);

**Odnoklassniki:** Social network (Apple ID 398465290);

**VK Music:** playlists & podcasts (Apple ID 1054372220).

However, on June 25, 2026, the Defendants, **without any prior notice and without explanation:**

**completely blocked** the access of "VK" LLC to the **Apple Developer Program** web platform under the user account "VK LLC" (ID: 4D6LA585PP);

**significantly restricted** access to the **App Store Connect** web platform under the specified account - thus limiting access to view the general service details (including financial information), while blocking the platform's core functionality, such as app management and distribution via the App Store. This effectively constitutes a total block on access of LLC "VK" to the App Store Connect web platform, under the aforementioned account;

**removed** the entire group of VK apps from the App Store;

following the removal of the Apps from the Store, users of the already installed Apps **ceased receiving push notifications** regarding new messages, calls, and other important events, thereby effectively depriving the Apps of a substantial portion of their functionality.

Through the aforementioned actions, the Defendants materially violated the Plaintiff's rights and legitimate interests and deprived end users of the ability to fully utilize the Applications (Appendix No. 5).

It was only after the unjustified removal of the Applications from public sources that it became known that Apple was citing "compliance with sanctions regulations,[3] despite the fact that, at that time, no restrictive measures had been imposed on the Plaintiff by the USA, the European Union, the UK, or other countries.

---

[3] https://www.rbc.ru/politics/25/06/2026/6a3d486e9a79474ccbf466ed (RBC, "Apple explains removal of VK apps from the App Store," June 25, 2026) (Appendix No. 6).

However, to date, the Defendants have not provided any justification for their actions addressed directly to the Plaintiff.

The shareholders of “VK” LLC are LLC “VK Company” (99.95%) and LLC “ITR” (0.05%, TIN: 7714482923); the ultimate owner of these entities is International Company Public Joint-Stock Company "VK" (IC PJSC "VK", VK; TIN: 3900015862) (Appendix No. 7):




As of the date of removal of the Apps (June 25, 2026), none of the listed companies were under sanctions.[4]

In any event, extensive case law confirms that anti-Russian sanctions violate the public policy of the Russian Federation and cannot serve as grounds for the unilateral refusal to perform contractual obligations (see, for example, Ruling of the Supreme Court of the Russian Federation dated March 12, 2024, No. 305-3C24-669 in Case No. A40-138158/2022; Resolution of the Arbitration Court of the Moscow District dated June 9, 2026, No. F05-27555/2024 in Case No. A40-290187/2023; Resolution of the Arbitration Court of the Ural District dated March 25, 2026, No. F09-4193/25 in Case No. A60-10502/2024; etc.).

Thus, the Defendants' unlawful unilateral refusal to perform contractual obligations, owed to the Plaintiff, constitutes grounds for filing the present lawsuit - seeking to have said refusal declared an invalid transaction and to compel the Defendants to fully restore access to the Apple Developer Program and App Store Connect web platforms, restore the Applications to the App Store, and restore the functionality of Applications already installed on users' devices.

**Furthermore, the Plaintiff reserves the right to amend its claims and seek recovery of damages caused by the Defendants' unlawful refusal to perform their obligations under the License Agreement.**

Undoubtedly, the actions of the Defendants are causing losses to the Plaintiff (specifically, losses related to advertising arrangements). The amount of such losses will be determined subsequently, and also claimed from the Defendants for compensation, within the framework of these proceedings at a later stage.

**1. Justification for the joinder of multiple defendants.**

Pursuant to Part 2 of Article 46 of the Arbitration Procedure Code of the Russian Federation, the joinder of multiple defendants is permitted if:

1) the subject matter of the dispute involves common rights and (or) obligations of several defendants;

2) the rights and (or) obligations of several defendants arise from the same legal basis;

3) the subject matter of the dispute involves homogeneous rights and obligations.

In other words, a prerequisite for such joinder is a homogeneous substantive legal interest in the case at hand.

[4] Restrictive measures against IC PJSC "VK" and Ms. Bagudina (General Director of IC PJSC "VK") were introduced on July 13, 2026 (Appendix No. 8).

In the Plaintiff's view, the actions of each of the Defendants were aimed at violating its rights, as evidenced by the following:

1) The license agreement was entered into with Apple Inc. (**Defendant 1**):

2) Pursuant to Paragraph 2 of Tab A to Appendix 1 and Paragraph 2 of Supplement A to Appendix 2 of the License Agreement, the Plaintiff's commission agent, directly engaged in the marketing and sale of the Plaintiff's Applications in the Russian Federation, is Apple Distribution International Ltd. (**Defendant 2**). **In other words, the License Agreement is effectively tripartite, and its performance, on the part of Apple, is ensured through the joint actions of Apple Inc. and Apple Distribution International Ltd.**

3) "APPLE RUS" LLC (**Defendant 3**) acts as the de facto representative office of Defendant 1, as it is wholly controlled by Apple Inc. (through Apple Distribution International Ltd. [99.5% stake] and Apple Operations International Ltd. [0.5% stake]; see Appendix 10) and effectively carries out Apple Inc.'s operations within the Russian Federation.

According to the Unified State Register of Legal Entities (USRLE), "APPLE RUS" LLC engages in the wholesale trade of computers, computer peripheral equipment, and software (Code 46.51), computer consultancy and related activities (Code 62.02), and advertising activities (Code 73.11) According to the explanatory notes to the company's 2025 financial statements, Apple Inc. is the parent company of "APPLE RUS" LLC, and the latter's primary accounts payable consist of amounts owed to Apple Distribution International for the purchase of goods (see Appendices 10 and 11).

Thus, the performance of Apple's obligations under the License Agreement — specifically regarding the marketing and distribution of the Plaintiff's Applications within the Russian segment of the App Store, as well as their sale to end users within the Russian Federation — was effectively carried out jointly by all Defendants, including "APPLE RUS" LLC.

Case law, confirming the potential joint and several liability of a local entity and its status as a de facto representative — where courts reached similar conclusions regarding "Google" LLC — includes the Resolution of the Moscow District Arbitration Court dated January 22, 2024 (Case No. F05-28458/2022, Case No. A40-126705/2022), as well as judicial acts in Case Nos. A40-155367/2020, A40-74815/2022, A40-74085/2022, A40-97559/2022, and A40-98239/2022. For instance, in Case No. A40-155367/2020, the following was established:

> *"Pursuant to Article 322 of the Civil Code of the Russian Federation, a joint and several obligation (liability) or a joint and several claim arises — if such joint nature is stipulated by contract or established by law — specifically where the subject matter of the obligation is indivisible.*
>
> *Google LLC (USA) is the parent company of the Google Group, owning Google Ireland Limited (Ireland) and, indirectly, 'Google' LLC.*
>
> *The evidence presented indicates that it is impossible to separate the plaintiff's claim against each of the co-defendants; therefore, the joint and several claim is well-founded.*
>
> *'Google' LLC acts as a 'de facto' division of Google LLC within the territory of the Russian Federation. On the official website www.google.com, 'Google' LLC is listed as Google's office in Russia (Vol. 2, pp. 50-53). That is, 'Google' LLC performs the functions of a Russian division for the defendant group of companies.*
>
> *According to the All-Russian Classifier of Economic Activities, the main activity of 'Google' LLC is '73.11 Activities of advertising agencies,' in particular the provision of all types of advertising services. Within the Google Group of Companies, this activity is carried out through the Google Ads service. The court notes that the subject matter of the invoice agreement is the provision of access to Google Ad Manager to the plaintiff. On the company's website, Google Ad Manager is referred to as a service related to Google Ads, Ad Sense, etc.*
>
> *Thus, the services provided by 'Google' LLC and Google Ireland Limited (Ireland) under the invoice agreement cannot be separated. If the transfer of funds from the use of the service is carried out by Google*

> *Ireland Limited (Ireland) then technical and customer support of the service, searching for and working with advertisers in the territory of the Russian Federation are carried out by 'Google' LLC. As asserted by the plaintiff and not disputed by the defendants, it was Google LLC that commented, in the media, on the situation regarding the blocking of the plaintiff's account. The defendants did not provide evidence to the contrary.*
>
> *The conclusion of the invoice agreement dated December 30, 2019, was impossible without the plaintiff having a Google account, i.e., without concluding an agreement with Google LLC (USA). The defendants themselves acknowledge this in their written submissions (Vol. 12, pp. 49-51). Google LLC (USA) and Google Ireland Limited (Ireland) are part of the same group of companies, whose main activity is aimed at providing users with various Internet services.*
>
> *Upon analyzing the circumstances of the case, the court determined that the defendants' actions were coordinated and that they utilized the same tools to provide services (shared software, service policies, etc.); consequently, the claims against them are fundamentally indivisible, providing grounds to impose upon them a joint and several obligation to restore the plaintiff's access to their Google account and services and to reinstate the terminated agreements."*

Thus, the Plaintiff maintains that its claims should be heard against all three jointly and severally liable Defendants, who contributed to the violation of its rights and bear joint (joint and several) liability for the violations committed.

**2. Compliance with the pre-litigation dispute resolution procedure (Part 5, Article 4 of the Arbitration Procedure Code of the Russian Federation)**

The rules of the Russian Arbitration Procedure Code do not mandate a pre-litigation dispute resolution procedure for claims challenging a unilateral termination of a contract and seeking the reinstatement of the contract's effect (Paragraph 29 of Resolution No. 18 of the Plenum of the Supreme Court of the Russian Federation dated June 22, 2021, "On Certain Issues Regarding Pre-Litigation Dispute Resolution in Civil and Arbitration Proceedings").

**3. Jurisdiction of the dispute to this court**

**3.1. Invalidity of the prorogation agreement**

Pursuant to Article 252 of the Commercial Arbitration Code of the Russian Federation, where a prorogation agreement exists, providing for the submission of a dispute to the competent court of a foreign state, the arbitration court of the Russian Federation shall leave the statement of claim or application without consideration if any party — no later than the day of submitting its first statement on the merits of the dispute to the arbitration court of first instance — raises an objection on these grounds regarding the hearing of the case by the arbitration court of the Russian Federation; this rule does not apply if the arbitration court determines that the prorogation agreement is invalid, has ceased to be effective, is incapable of being performed, or does not provide for the exclusion of the jurisdiction of the arbitration courts of the Russian Federation (Part 5 of Article 3, Paragraph 5 of Part 1 of Article 148 of the Arbitration Procedure Code of the Russian Federation). These rules apply, regardless of whether a case concerning the dispute between the parties to the prorogation agreement is pending before a foreign court (Paragraph 11 of Resolution No. 23 of the Plenum of the Supreme Court of the Russian Federation dated June 27, 2017, "On the Hearing by Arbitration Courts of Cases Involving Economic Disputes Arising from Relations Complicated by a Foreign Element").

**3.1.1.** In the Plaintiff’s view, notwithstanding the inclusion of a prorogation clause in the License Agreement — designating the courts of the Northern District of California (Paragraph 14.10 of the License Agreement) — this dispute falls within the jurisdiction of the arbitration courts of the Russian Federation, as said paragraph is void and, in any event, unenforceable.

The invalidity (or unenforceability) of the prorogation clause stems from the fact that a U.S. state court, located where Apple Corporation’s headquarters are situated, would undoubtedly apply U.S. sanctions law — laws that conflict with the public policy of the Russian Federation and other overriding mandatory rules of Russian law.

For instance, that very court in the Northern District of California — acting to support another U.S. Big Tech entity, Google (Alphabet) Corporation — issued a patently unlawful ruling, declaring that only a U.S. court could adjudicate a dispute regarding subsidiary liability in the bankruptcy proceedings of the Russian entity “Google” LLC and the challenge to a transaction between the Russian debtor and an Irish entity within the Google Group (Appendix No. 12). This ruling was issued, despite the fact that a Russian court — both within the bankruptcy case itself (Case No. A40-126705/2022) and in separate disputes (Case Nos. A40-24249/2025 and A40-189091/2025) — had expressly prohibited the continuation of such proceedings, citing provisions regarding the exclusive jurisdiction of Russian bankruptcy courts (judicial acts – Appendix No. 13).

**3.1.2.** It should additionally be noted that, as previously stated, the Plaintiff entered into the License Agreement by way of adhesion — that is, in a manner that did not allow the Plaintiff to influence the content of the document being signed, including the choice of the competent court.

Accordingly, upon acceding to the License Agreement, the Plaintiff had no opportunity to express its intent regarding the submission of disputes to a U.S. court, which constitutes grounds for deeming the prorogation agreement unenforceable.

As noted by the Arbitration Court of the Moscow District in its Resolution No. F05-27555/2024 dated December 18, 2024, in Case No. A40-290187/2023:

*"It follows from the literal wording of Paragraph 5, Part 1, Article 148 of the Arbitration Procedure Code of the Russian Federation that a statement of claim may be left without consideration only if there is an agreement between the parties to have the dispute heard by another court.*

*Pursuant to Paragraph 5, Part 1, Article 148 of the Arbitration Procedure Code of the Russian Federation, an exception applies where the agreement cannot be performed.*

*From the provisions of Paragraphs 1, 3, and 6 of the Information Letter of the Presidium of the Supreme Arbitration Court of the Russian Federation dated July 9, 2013, No. 158, as applied to the circumstances of this case, it follows that when resolving the issue of the validity of the prorogation agreement, the circumstance must be established regarding whether the will of the parties was aimed at resolving the dispute in the courts of England.*

*Paragraph 8 of the Resolution of the Plenum of the Supreme Court of the Russian Federation No. 23 dated June 27, 2017 states that an enforceable prorogation agreement is understood as an agreement on the basis of which the true intention (actual will) of the parties regarding the jurisdiction of an arbitration court of the Russian Federation can be established.*

*Paragraph 30 of the Resolution of the Plenum of the Supreme Court of the Russian Federation No. 53 dated December 10, 2019 states that an unenforceable arbitration agreement is understood as an agreement from the content of which the parties' intent regarding the chosen arbitration procedure cannot be established (for example, it is impossible to determine whether a specific institutional arbitration or 'ad hoc' arbitration was selected) or which cannot be performed in accordance with the parties' intent (for example, the agreed arbitration institution is not authorized to administer the arbitration, in accordance with the requirements of applicable law).*

*With reference to Part 5 of Article 3 of the Arbitration Procedure Code of the Russian Federation, the appellate court deems it permissible to apply the provisions of Paragraph 8 of the Resolution of the Plenum of the Supreme Court of the Russian Federation No. 23 dated June 27, 2017 and Paragraph 30 of the Resolution of the Plenum of the Supreme Court of the Russian Federation No. 53 dated December 10, 2019 to the present dispute*

*As stated above, the license agreement was not concluded directly between the plaintiff and the defendant.*

***Access to Cisco software, under the end user license agreement, is provided via the website of the rights holder, Cisco, using activation keys (a sequence of characters) in the user's personal account on the website https://id.cisco.com/.***

***The license agreement is deemed to have been concluded between the plaintiff and the defendant at the moment the plaintiff (the end user) activated it within the Cisco service contracts personal account.***

***In the view of the appellate court, under these circumstances, the plaintiff could not influence the content of the license agreement, including the provision of Paragraph 12.9 regarding the resolution of disputes in English courts.***

***The plaintiff had no intent of entering into a prorogation agreement regarding the resolution of disputes in English courts as they became a party to the license agreement automatically (through the act of activation).***

*Based on the foregoing, the appellate court correctly concluded that the prorogation agreement (Paragraph 12.9 of the license agreement) is unenforceable, as there was no genuine intent (actual will) on the part of the plaintiff to submit disputes to English courts."*

In the event of the invalidity or unenforceability of a prorogation agreement, the general rules of the Arbitration Procedure Code of the Russian Federation regarding the determination of jurisdiction apply (Paragraphs 1-4 of Part 1 of Article 247 of the Arbitration Procedure Code of the Russian Federation).

**3.2. A representative office of Defendant 2 operates within the territory of the Russian Federation.**

Pursuant to Paragraph 2, Part 1, Article 247 of the Arbitration Procedure Code of the Russian Federation, arbitration courts in the Russian Federation hear cases involving economic disputes with the participation of foreign entities if the management body, branch, or representative office of the foreign entity is located within the territory of the Russian Federation.

Apple Distribution International Ltd. is one of the few technology companies that has assigned the fulfillment of obligations, under Federal Law No. 236-FZ dated July 1, 2021, "On the Activities of Foreign Entities in the 'Internet' Information and Telecommunications Network within the Territory of the Russian Federation" (hereinafter referred to as "Law No. 236-FZ"), to specific legal entities established by it within the Russian Federation under Russian law (divisions of foreign legal entities).

Pursuant to Article 7 of Law No. 236-FZ, such a Russian legal entity, inter alia, receives and reviews inquiries from Russian citizens and organizations addressed to the foreign entity operating on the Internet within the Russian Federation, ensures compliance with court rulings and decisions (or demands) issued by Russian government authorities regarding said foreign entity, **and also represents the interests of the foreign entity operating on the Internet, within the Russian Federation, in court proceedings.**

The functions of such a Russian legal entity are performed by the Moscow representative office of Apple Distribution International Ltd. (Appendix No. 9).

The representative office is located in the city of Moscow. Accordingly, any dispute is subject to adjudication by the Arbitration Court of the City of Moscow.

**3.3. The License Agreement was performed primarily within the territory of Russia.**

The Plaintiff’s applications were developed primarily for distribution among Russian citizens, within the Russian Federation (the place of performance of the License Agreement; Paragraph 3, Part 1, Article 247 of the Arbitration Procedure Code of the Russian Federation).

According to VK’s 2025 annual report (page 17 of the presentation, Appendix No. 1), in the fourth quarter of 2025, the average monthly audience of VKontakte, in the Russian Federation, reached 93.4 million users, while the global audience reached 109.2 million people.

It was within the Russian Federation that the Plaintiff incurred the greatest losses due to the Defendants' unjustified refusal to fulfill their obligations.

Furthermore, it was within the territory of the Russian Federation that the greatest harm resulting from the Defendants' actions occurred — specifically, the loss of user access to the applications and their full functionality.

**3.4. Assets belonging to foreign Defendant 1 (represented by its de facto representative office – Defendant 3) are located within the territory of the Russian Federation.**

Pursuant to Paragraph 1, Part 1, Article 247 of the Arbitration Procedure Code of the Russian Federation, arbitration courts in the Russian Federation hear cases involving economic disputes with foreign parties if the defendant’s assets are located within the territory of the Russian Federation.

As previously mentioned, Defendant 1 is represented within the Russian Federation by a Russian legal entity that it owns — Defendant 3, “APPLE RUS” LLC. According to financial statement data, as of the end of 2025, Defendant 3 held cash in accounts totaling RUB 190.5 million and accounts receivable amounting to RUB 2.5 billion (Appendix No. 11).

As previously mentioned, “APPLE RUS” LLC is wholly controlled by Apple Inc. and effectively conducts Apple Inc.’s business operations within the Russian Federation; according to the Unified State Register of Legal Entities (EGRUL), “APPLE RUS” LLC engages in the wholesale trade of computers, computer peripheral equipment, and software (Code 46.51), computer technology consultancy and related activities (Code 62.02), and advertising activities (Code 73.11).

Thus, the performance of Apple’s obligations under the License Agreement regarding the marketing (promotion) of the Plaintiff’s Applications in the Russian segment of the App Store, as well as the sale of the Plaintiff’s Applications to end users within the Russian Federation, was carried out jointly by all Defendants, including “APPLE RUS” LLC.

Regarding the conclusion that, under similar factual circumstances, a local legal entity should be treated as a “de facto” representative office, see the Resolution of the Arbitration Court of the Moscow District dated January 22, 2024 (Case No. F05-28458/2022, Case No. A40-126705/2022), as well as judicial rulings in Case Nos. A40-155367/2020, A40-74815/2022, A40-74085/2022, A40-97559/2022, and A40-98239/2022, in which courts reached similar conclusions regarding “Google” LLC. Specifically, the ruling in Case No. A40-155367/2020 established the following:

> *“‘Google’ LLC acts as a ‘de facto’ division of Google LLC within the territory of the Russian Federation. On the official website www.google.com, ‘Google’ LLC is listed as Google’s office in Russia (Vol. 2, pp. 50-53). That is, ‘Google’ LLC performs the functions of a Russian division for the defendant group of companies.*
>
> *According to the All-Russian Classifier of Economic Activities, the main activity of ‘Google’ LLC is ‘73.11 Activities of advertising agencies,’ in particular the provision of all types of advertising services. Within the Google Group of Companies, this activity is carried out through the Google Ads service. The court notes that the subject matter of the invoice agreement is the provision of access to Google Ad Manager to the plaintiff. On the company's website, Google Ad Manager is referred to as a service related to Google Ads, Ad Sense, etc.”*

**3.5.** In this regard, the Plaintiff notes that it has asserted claims against the Defendants — three jointly and severally liable debtors — two of whom are located in the Russian Federation (Defendant 2 and Defendant 3)

Due to the joint and several nature of the Defendants' obligations, the jurisdiction of the Arbitration Court of the City of Moscow over this dispute was determined at the Plaintiff's discretion, pursuant to Article 247 of the Arbitration Procedure Code of the Russian Federation, taking into account the provisions of Part 2 of Article 36 of the Arbitration Procedure Code of the Russian Federation — specifically, based on the location of one of the defendants chosen by the plaintiff, by statutory analogy — which aligns with judicial practice:

> *“‘JSC “Kolkhoz im. Bekereva’ filed a claim seeking to recover actual damages from Zeppelin Power Systems GmbH in the amount of RUB 275,148,005.41, USD 520,352.37, as well as lost profits in the amount of RUB 64,845,666.46; these damages were incurred by the plaintiff during the provision of supervision-of-installation services by Zeppelin Power Systems GmbH for the repair of a MaK 6M32 diesel engine (serial number 637079) following 90,000 operating hours.*
>
> *By an order of the Arbitration Court of the Moscow Region dated April 25, 2024, and upon the plaintiff's motion, ‘Zeppelin Power Systems Russland’ LLC was joined to the case as a co-defendant, pursuant to Article 46 of the Arbitration Procedure Code of the Russian Federation; subsequently, in accordance with Article 49 of the Arbitration Procedure Code of the Russian Federation, the plaintiff amended its claims and requested the recovery of the damages incurred jointly and severally from Zeppelin Power Systems GmbH and ‘Zeppelin Power Systems Russland’ LLC.*
>
> *(...) Pursuant to Part 2 of Article 36 of the Arbitration Procedure Code of the Russian Federation, a claim against defendants located or residing in the territories of different constituent entities of the Russian Federation shall be filed with the arbitration court at the location or place of residence of one of the defendants.*
>
> *According to Part 5 of Article 3 of the Arbitration Procedure Code of the Russian Federation, in the absence of a rule of procedural law governing relations arising during proceedings in arbitration courts, the courts shall apply a rule governing similar relations (statutory analogy), and in the absence of such a rule, they shall act based on the principles of the administration of justice in Russia (legal analogy).*
>
> *In view of the foregoing, the venue for the dispute in this case must be determined based on Part 2 of Article 36 of the Arbitration Procedure Code of the Russian Federation, taking into account the provisions of Articles 247 and 248.1 of the Arbitration Procedure Code of the Russian Federation — that is, at the location of one of the defendants, at the plaintiff's discretion, by statutory analogy.*
>
> *Given the restrictive measures currently in effect against the Russian Federation and Russian legal entities, the plaintiff's ability to protect its rights and economic interests is significantly limited; considering that the protection of the applicant's rights and interests can currently be effected exclusively within the*

*territory and jurisdiction of the Russian Federation, the plaintiff, by filing the claim with the Arbitration Court of the Moscow Region pursuant to Articles 247 and 248.1 of the Arbitration Procedure Code of the Russian Federation, lawfully exercised its right to choose the venue by bringing the action at the location of the second defendant ("Zeppelin Power Systems Russland" LLC).*

*Given that the protection of the applicant's rights and interests can currently be effected solely within the territory and jurisdiction of the Russian Federation and that the court of first instance reached its conclusions regarding representation, without evaluating the position set forth in Paragraph 9 of the Information Letter of the Presidium of the Supreme Arbitration Court of the Russian Federation dated July 9, 2013, No. 158, there were no grounds for transferring the case to another court based on jurisdictional rules."*

(Resolution of the 10th Arbitration Court of Appeals dated September 19, 2024, Nos. 10AP-16581/2024 and 10AP-16582/2024 in Case No. A41-69832/2022; upheld by higher courts)

**4. Applicable law.**

Pursuant to Paragraph 14.10 of the License Agreement, the laws of the United States and the State of California govern the resolution of disputes. However, the Plaintiff maintains that the choice-of-law clause is unenforceable and that the norms of Russian law apply to the resolution of this dispute.

Specifically, U.S. law contains sanction provisions which, according to publicly available sources, served as the basis for removing the Applications from the App Store and unilaterally terminating the License Agreement.

At the same time, economic sanctions, imposed by a foreign state, cannot serve as grounds for violating the rights of a Russian legal entity — including through the unilateral termination of contracts — because such economic sanctions contravene the public policy of the Russian Federation and are not applicable within its territory by virtue of an express statutory provision.

Pursuant to Article 1193 of the Civil Code of the Russian Federation, a rule of foreign law that would otherwise apply under the rules of Section VI of the Civil Code shall not be applied in exceptional cases where the consequences of its application would manifestly contravene the foundations of the legal order (public policy) of the Russian Federation.

According to Paragraph 5, Clause 1 of the Information Letter of the Presidium of the Supreme Arbitration Court of the Russian Federation No. 156 dated February 26, 2013, public policy comprises fundamental legal tenets (principles) that possess supreme mandatory force, universality, and special social and public significance and which form the basis of the state's economic, political, and legal systems. Such principles include, in particular, the prohibition against actions expressly forbidden by overriding mandatory norms of Russian legislation, where such actions cause damage to state sovereignty or security, affect the interests of large social groups, or violate the constitutional rights and freedoms of private individuals.

Part 1 of Article 1 of Federal Law No. 127-FZ dated June 4, 2018, "On Measures of Influence (Counteraction) Against Unfriendly Actions of the United States of America and Other Foreign States," classifies economic sanctions — imposed against the Russian Federation, its citizens, or Russian legal entities — as unfriendly actions by the USA that pose a threat to the territorial integrity of the Russian Federation and aim to destabilize it economically and politically.

The Constitutional Court of the Russian Federation has also pointed out the illegality of actions associated with the application of economic sanctions by foreign states. Specifically, pursuant to Resolution No. 8-P dated February 13, 2018, judicial protection is not available for a right, the exercise of which is conditioned upon compliance with a sanction regime against the Russian Federation or its business entities, where such sanctions have been established by a state outside of proper international legal procedures and in contravention of multilateral international treaties to which the Russian Federation is a party.

This is confirmed by consistent judicial practice — specifically, court rulings at all levels in Cases No. A40-155367/2020, No. A40-132383/2021, No. A82-8396/2024, and a number of other cases.

For instance, in the decision of the Arbitration Court of the City of Moscow dated April 20, 2021, regarding Case No. A0-155367/2020, the court stated:

> *"The sanctions applied against K.V. Malofeev — and, consequently, against the plaintiff — constitute provisions of US and EU public law; that is, they represent directives from foreign authorities imposing various public-law restrictions on the rights and obligations of private individuals. Public law does not have extraterritorial effect; therefore, US and EU sanction legislation creates no rights and imposes no obligations on Russian citizens and legal entities. This aligns with the fundamental principles regarding the inadmissibility of interference in the internal affairs of states and state sovereignty (Declaration on the Inadmissibility of Intervention in the Domestic Affairs of States and the Protection of Their Independence and Sovereignty, adopted by the UN General Assembly in Resolution 2131 (XX) dated December 21, 1965)."*

Furthermore, the ruling of the Moscow District Arbitration Court dated April 24, 2026, No. F05-965/2026 in case No. A40-148095/2024 states:

> *“Pursuant to Article 1210, Paragraph 1 of the Civil Code of the Russian Federation, the parties to a contract may, either upon conclusion of the contract or subsequently, select, by mutual agreement, the law applicable to their rights and obligations under said contract.*
>
> *Under Article 1193 of the Civil Code of the Russian Federation, a rule of foreign law that would otherwise apply pursuant to the rules of Section VI of the Civil Code of the Russian Federation shall not be applied in exceptional cases where the consequences of its application would manifestly contravene the fundamental principles of the legal order (public policy) of the Russian Federation, taking into account the nature of the relationship involving a foreign element. In such an event, the relevant rule of Russian law shall apply where necessary.*
>
> *The courts rightly proceeded on the premise that economic sanctions, imposed by foreign states against Russian legal entities — and invoked as grounds for restricting the rights of such an entity — must not be taken into account by the court when resolving a dispute within the territory of the Russian Federation; this applies with due regard for the provisions of Part 1, Article 1 of Federal Law No. 127-FZ dated June 4, 2018, "On Measures of Influence (Countermeasures) Regarding Unfriendly Actions of the United States of America and Other Foreign States," as well as Article 1193 of the Civil Code of the Russian Federation. In this case, it was established that the defendants blocked the account in question, citing international sanctions. As noted above, the defendants failed to submit evidence demonstrating that the blocking was caused by the plaintiff’s violation of the contract terms or the service's rules of use.*
>
> *Under these circumstances, applying rules of foreign law to the disputed relationship — where such law permits the restriction of a Russian legal entity's rights, based on sanctions that contravene the public policy of the Russian Federation — would lead to a result incompatible with the fundamental principles of the legal order of the Russian Federation. In this regard, the courts rightly invoked the public policy exception and denied the motion to appoint a court-ordered expert examination to establish the content of English law, since the application of such rules would have been impossible in any event due to their conflict with the public policy of the Russian Federation.”*

Thus, since the applicable law clauses refer to legal norms, the application of which would contravene the public policy of the Russian Federation, the only law capable of ensuring a balance of the disputing parties' interests is Russian law, as the law of the jurisdiction where the Defendants directly distribute the Plaintiffs' Applications, i.e., where the performance of decisive importance to the License Agreement takes place (Articles 1186 and 1211 of the Civil Code of the Russian Federation).

**5. Notice to Foreign Defendants.**

Pursuant to Paragraph 32 of the Resolution of the Plenum of the Supreme Court of the Russian Federation No. 23 dated June 27, 2017, "On the Consideration by Arbitration Courts of Cases Involving Economic Disputes Arising from Relations Complicated by a Foreign Element" (hereinafter referred to as **"Plenum No. 23"**), and in light of the provisions of Part 2 of Article 253 of the Arbitration Procedure Code of the Russian Federation and Paragraph 3 of Article 54 of the Civil Code of the Russian Federation, if a representative of a foreign entity, authorized to receive notice of court proceedings and other court documents, is located within the territory of the Russian Federation, such documents shall be sent to the address of said representative, in accordance with the general procedure prescribed by Articles 121 and 123 of the Arbitration Procedure Code of the Russian Federation. In such a case, sending court documents to the party's address in the foreign state is not required.

Thus, sending documents to the address of Defendant 2's representative office in Moscow constitutes proper notification (Appendix No. 18).

The Plaintiff also sent the statement of claim and its attachments to Defendant 1's foreign address using the EMS courier service (Appendix No. 18).

To facilitate the administration of justice, the Plaintiff proposes that the Court assign to it the obligation to properly notify the Defendants of the commencement of the judicial proceedings.

The Plaintiff intends to have court-certified copies of the rulings of the Arbitration Court of the City of Moscow — scheduling the hearing — translated into English, the official language of the country where Defendant 1 is incorporated (with the translator's signature notarized) and to send them to the address of Defendant 1 specified in its registration documents via EMS, DHL, or another similar courier service.

The Plaintiff submits that such service would constitute proper notification of the foreign Defendant 1 regarding the present proceedings and would also serve as a permissible measure of procedural economy aimed at minimizing delays in the case proceedings. The viability of such a mechanism for notifying foreign participants in arbitration proceedings is supported by judicial practice:

Resolution of the Arbitration Court of the Moscow District dated December 5, 2018, No. F05-18565/2018 in Case No. A40-216909/2017:

> *"On January 23, 2018, in order to assist the Arbitration Court of the City of Moscow, CJSC 'FCSR' sent — via DHL services — the Arbitration Court of the City of Moscow's ruling dated January 10, 2018, in Case No. A40-216909/17, along with a notarized English translation, to the address of Positive Resolve Limited (waybill number 9016504254).*
>
> *According to the DHL Express shipment tracking record, the documents were delivered to the destination address on January 30, 2018. Isalene Cuffy signed for the delivery.*
>
> *Under these circumstances, the appellate court rightly held that the requirements of Article 121 of the Arbitration Procedure Code of the Russian Federation and Article 10 of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (signed in The Hague on November 15, 1965) had been met and that Positive Resolve Limited had been duly notified and had the opportunity to exercise its procedural rights to participate in the case."*

The ruling of the 13th Arbitration Court of Appeal dated February 25, 2026 (No. 13AP-30952/2025) in Case No. A56-71206/2024 states:

> *"The appellate court also rejects the argument raised in the appeal regarding improper notification of the Defendants.*
>
> *As the court correctly noted, the service of judicial documents abroad is governed by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (concluded in The Hague on November 15, 1965; hereinafter referred to as the 'Convention'). The Russian Federation and the United States of America are contracting parties to the Convention.*

*As explained in the information provided by the Ministry of Justice of the Russian Federation titled 'On the Procedure for Drafting and Executing Requests for the Service of Documents and the Taking of Evidence in Civil or Commercial Matters under the 1965 Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, the 1970 Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, and the 1954 Convention on Civil Procedure,' the Russian Federation made a declaration upon acceding to the Convention stating that the charging of fees for the service of documents by any contracting state would be regarded by the Russian Federation as a refusal to apply the Convention with respect to Russia; consequently, the Russian Federation would not apply the Convention in its relations with such a contracting state. The United States has introduced such fees; therefore, the rules of the Service Convention do not apply to the service of Russian judicial documents on persons located within the territory of the United States. In the current situation, the possibility remains — at least in theory — of serving judicial and extrajudicial documents directly upon the defendant via registered mail; according to information provided by the U.S. Department of State, this practice does not conflict with U.S. law.*

*The court found that the plaintiff had delivered the following documents to the defendants via courier service: the court order accepting the statement of claim for consideration, the court order scheduling the hearing, and the statement of claim itself — all accompanied by notarized English translations — thereby demonstrating that the defendants were duly notified."*

Accordingly, in the interests of conserving court resources and expediting the resolution of the dispute — and taking into account the caseload of the Arbitration Court of the City of Moscow — the Plaintiff is prepared to assume the obligation of notifying the Defendants. This will be done by sending notarized copies of the court orders and scheduling the hearing (translated into English) to the registered address of Defendant 1 via DHL or another similar courier service.

In light of the foregoing, the Plaintiff requests that the Court schedule a preliminary hearing for this case — observing standard case processing timeframes and the Court's schedule — without allocating additional time for the notification of foreign parties to the proceedings via the Ministry of Justice of the Russian Federation.[5]

**6. Legal grounds for the claims**

**6.1. The Defendants have unjustifiably refused to perform their obligations under the License Agreement, in direct violation of their obligations thereunder.**

Paragraph 2.1 of the License Agreement stipulates that the Company's access to Apple services is provided through a developer account opened for it, which is accessed using Apple products, specifically, App Store Connect.

Pursuant to Clause 7 of the License Agreement, applications developed by the Company that comply with Apple's documentation requirements, have passed the selection process, and have received Apple's digital signature (in accordance with Clauses 5 and 6 of the License Agreement) are distributed via channels including the App Store.

Under Clause 1.1 of Appendix No. 1 to the License Agreement, the Company appoints the Defendants as its commission agents; their duties include advertising the Plaintiff's Applications, offering them for sale, collecting payments from end users, and providing users with access to copies of the Applications for download.

However, as previously mentioned, on June 25, 2026, the Plaintiff's Applications were removed from the App Store without any justification, resulting in the following:

[5] The participation of foreign parties in a case does not in itself imply that the case is particularly complex and, therefore, does not warrant extending the adjudication period to six months, pursuant to Part 2 of Article 152 of the Arbitration Procedure Code of the Russian Federation (Paragraph 2, Paragraph 29 of Resolution of the Plenum No. 23).

- the Plaintiff's Applications ceased to be available for user download;
- the Plaintiff ceased receiving payments due from users;
- the Plaintiff was denied access to the Apple Developer Program and App Store Connect web platforms using its accounts;

which constitute a clear violation by the Defendants of the provisions of the License Agreement and Appendices 1 and 2 thereto.

Furthermore, pursuant to Addendum 1 to the License Agreement, Apple provides the Company with the Apple Push Notification service (APN) for use with the Applications. The Company is entitled to use the APN service to send push notifications to its Applications (Paragraph 1.2 of Addendum 1).

However, starting from June 25, 2026, the functionality of the Plaintiff's Applications installed on users' devices has been significantly restricted: push notifications are no longer delivered to them, meaning the Defendants have unilaterally ceased providing the Apple Push Notification service (APN).

Obligations must be performed properly, in accordance with the terms of the obligation and the requirements of the law (Article 309 of the Civil Code of the Russian Federation). The Defendants' removal of the Plaintiff's Applications from the App Store, the termination of the push notification service, the blocking of payments, and the blocking of access to the Apple Developer Program and App Store Connect web platforms constitute a clear violation of the Defendants' obligations under the License Agreements.

**6.2. An unjustified unilateral refusal to perform the License Agreements is null and void**

When exercising the right to unilaterally modify the terms of an obligation or to unilaterally refuse to perform it, a party must act reasonably and in good faith, taking into account the rights and legitimate interests of the other party (Paragraph 3 of Article 307, Paragraph 4 of Article 450.1 of the Civil Code of the Russian Federation).

A breach of this duty may result in a refusal of judicial protection for the said right, in whole or in part, including a declaration that the unilateral modification of the obligation's terms or the unilateral refusal to perform it is void (Paragraph 2 of Article 10, Paragraph 2 of Article 168 of the Civil Code of the Russian Federation) (Paragraph 14 of Resolution No. 54 of the Plenum of the Supreme Court of the Russian Federation dated November 22, 2016, "On Certain Issues Regarding the Application of General Provisions of the Civil Code of the Russian Federation on Obligations and Their Performance").

The right to unilaterally terminate a contract (or refuse performance thereof), granted by law or by the contract itself, may be exercised by the authorized party by notifying the other party of such termination (or refusal of performance). The contract terminates upon receipt of said notice, unless otherwise provided by law or the contract (Paragraph 1 of Article 450.1 of the Civil Code of the Russian Federation). The requirement to send such a notice is also stipulated in Paragraph 11.2 of the License Agreement.

**Under the applicable Russian law, the unilateral termination of the contract, between the Plaintiff and the Defendants, could only be effected for cause.**

**Furthermore, as of the date of filing this claim, the Defendants have not provided the Plaintiff with an official justification for their unilateral refusal. Moreover, the Plaintiff has received no notification whatsoever from the Defendants.**

The Defendants have presented no evidence of any breach of the License Agreement terms by the Plaintiff, and there are no grounds for refusing to perform the contract.

Thus, such an unjustified refusal constitutes a void transaction that entails no legal consequences (Articles 167 and 168 of the Civil Code of the Russian Federation).

**6.3. The Defendants' refusal to perform the License Agreement, on grounds related to sanctions, is invalid.**

In any event, economic sanctions, imposed by a foreign state, cannot serve as grounds for violating the rights of a Russian legal entity — including through unilateral termination of a contract — because such economic sanctions contravene the public policy of the Russian Federation and are not applicable within its territory by virtue of an express statutory provision.

Pursuant to Article 1193 of the Civil Code of the Russian Federation, a rule of foreign law that would otherwise apply under the rules of Section VI of the Civil Code shall not be applied in exceptional cases where the consequences of its application would manifestly contravene the foundations of the legal order (public policy) of the Russian Federation.

The content of the concept of "public policy" is clarified in Paragraph 5, Clause 1 of the Information Letter of the Presidium of the Supreme Arbitration Court of the Russian Federation dated February 26, 2013, No. 156. According to this letter, public policy is understood to mean fundamental legal tenets (principles) that possess supreme mandatory force, universality, and particular social and public significance and which form the foundation of the state's economic, political, and legal systems.

Such tenets include, in particular, the prohibition of actions expressly forbidden by overriding mandatory norms of Russian legislation, where such actions cause damage to state sovereignty or security, affect the interests of large social groups, or violate the constitutional rights and freedoms of private individuals.

Part 1 of Article 1 of Federal Law No. 127-FZ dated June 4, 2018, "On Measures of Influence (Counteraction) Regarding Unfriendly Actions of the United States of America and Other Foreign States," classifies economic sanctions against the Russian Federation, its citizens, or Russian legal entities as unfriendly actions by the USA which pose a threat to the territorial integrity of the Russian Federation and aim to destabilize it economically and politically.

Arbitration practice also confirms the conclusion that the application of foreign economic sanctions is impermissible due to their conflict with Russian public policy; see, for example, the Resolution of the Arbitration Court of the Moscow District dated February 17, 2026, No. F05-17716/2025 in Case No. A40-231664/2023:

> *"Sanctions — including those adopted and applied against the plaintiff and the third party — constitute norms of public law of the United States and the European Union; that is, they represent directives issued by foreign authorities, imposing various public law restrictions on the rights and obligations of private individuals.*
>
> *Public law lacks extraterritorial effect; consequently, the sanction legislation of the United States, the United Kingdom of Great Britain and Northern Ireland, and the European Union creates no rights and imposes no obligations upon Russian citizens and legal entities. This position aligns with the fundamental principles of state sovereignty and non-interference in the internal affairs of states (Declaration on the Inadmissibility of Intervention in the Domestic Affairs of States and the Protection of Their Independence and Sovereignty, adopted by the UN General Assembly Resolution 2131 (XX) of December 21, 1965).*
>
> *Thus, economic sanctions imposed by a foreign state cannot serve as grounds for violating a person's rights — including through unilateral termination of contracts — because such sanctions contravene the public policy of the Russian Federation and are not applicable within its territory by virtue of an express statutory provision."*

Consequently, the inclusion of a counterparty in a foreign state's sanctions list does not constitute valid grounds for terminating a contract within the Russian Federation, and any termination declared on such grounds is invalid.

Pursuant to Article 308.3 of the Civil Code of the Russian Federation, in the event of a debtor's failure to perform an obligation, the creditor is entitled to seek a court order for specific performance unless otherwise provided by law or contract or dictated by the nature of the obligation itself. Upon the creditor's request, the court may award a monetary sum, payable in the event of non-compliance with said judicial act;

the amount of such sum is to be determined by the court, based on principles of fairness, proportionality, and the prohibition against deriving benefit from unlawful or bad-faith conduct.

Due to the Defendants' bad-faith actions, the Plaintiff is suffering significant adverse consequences and is unable to fully conduct its business operations or generate profit.

The Plaintiff notes that the Defendants' wrongful actions in removing the Applications from the App Store have made it impossible for end users to download and fully utilize the Applications — not only in Russia but also in more than 40 other countries (including Belarus, Azerbaijan, Armenia, Kazakhstan, Kyrgyzstan, Moldova, Tajikistan, Uzbekistan, Georgia, Egypt, Indonesia, Malaysia, Thailand, Turkey, Turkmenistan, Vietnam, the UAE, Cuba, Laos, Cambodia, Afghanistan, Bolivia, Republic of the Congo, Colombia, Grenada, Gambia, India, Iraq, Saint Kitts and Nevis, Kuwait, Myanmar, Nicaragua, Pakistan, Qatar, Saudi Arabia, Venezuela, South Africa, and Tanzania); this further confirms the absolute lack of grounds for the unilateral termination of the License Agreement.

**In light of the foregoing, the Plaintiff requests that the Court impose a judicial penalty** for each day of non-compliance with the judicial act, regarding each of the Applications, commencing on the sixth day following the date the decision is issued, in full, and continuing until actual compliance, in the following amounts:

**VK:** social network, messenger (Apple ID 564177498) — in the amount of 50,000,000 (fifty million) rubles for each day of non-compliance with the judicial act;

**Odnoklassniki:** Social network (Apple ID 398465290) — in the amount of 3,000,000 (three million) rubles for each day of non-compliance with the judicial act;

**VK Music:** playlists & podcasts (Apple ID 1054372220) — in the amount of 5,000,000 (five million) rubles for each day of non-compliance with the judicial act.

The Court may not refuse to award a judicial penalty where a claim for specific performance of an obligation is granted (Paragraph 31 of Resolution No. 7 of the Plenum of the Supreme Court of the Russian Federation dated March 24, 2016, "On the Application by Courts of Certain Provisions of the Civil Code of the Russian Federation Regarding Liability for Breach of Obligations").

**7. Motion for immediate enforcement of the court judgment.**

Pursuant to Article 182 of the Arbitration Procedure Code of the Russian Federation, an arbitration court may, upon the plaintiff's application, order the immediate enforcement of a judgment if, due to special circumstances, a delay in enforcement could result in significant damage to the judgment creditor or render enforcement impossible.

As previously mentioned, VK is the largest Russian technology company by user count. Users of VK services account for 97% of the monthly audience of Runet (the Russian segment of the “Internet” network); that is, virtually all Internet users in Russia use the company's products.

The social networks VKontakte and Odnoklassniki are included in the List of Domestic Socially Significant Information Resources to which access must be provided by telecommunications operators pursuant to Federal Law No. 126-FZ of July 7, 2003, "On Communications" (see Order of the Ministry of Communications of Russia No. 148 dated March 31, 2020 (as amended on July 1, 2021), "On Conducting an Experiment to Provide Citizens, Free of Charge, with Data Transmission and Internet Access Services within the Russian Federation for the Purpose of Using Socially Significant Information Resources on the Internet").

Accordingly, the Government of the Russian Federation has affirmed the socially significant status of the Applications, the availability and functionality of which must be maintained as a matter of priority.

Thus, the immediate restoration of the Applications in the Apple Store and the restoration of their full functionality (specifically, instant notifications regarding incoming calls and messages) are necessary, not only in the interests of the Plaintiffs, but also in the public interest.

Pursuant to Articles 168, 309, 308.3, 310, 1193, and 1211 of the Civil Code of the Russian Federation and Articles 125, 126, and 247 of the Arbitration Procedure Code of the Russian Federation, “VK” LLC

**REQUESTS THE ARBITRATION COURT TO:**

**1.** Declare invalid the unilateral withdrawal by **Apple Inc.** (Registration number 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (Registration number 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE), and **“APPLE RUS” LLC** (TIN: 7707767220, OGRN: 5117746070019, 4 Romanov Pereulok, building 2, floor 6, Premises II, Office 54, Moscow, 125009) from the performance of the License Agreement regarding the use of the Apple Developer Program — user account "VK LLC" (ID: 4D6LA585PP) — concluded with “VK LLC” (TIN: 7743001840, OGRN: 1027739850962, 39 Leningradsky Prospekt, building 79, Moscow, 125167).

**2.** Order the jointly and severally liable defendants — **Apple Inc.** (Registration number 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (Registration number 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE), and **“APPLE RUS” LLC** (TIN: 7707767220, OGRN: 5117746070019, 4 Romanov Pereulok, building 2, floor 6, Premises II, Office 54, Moscow, 125009) — to fully restore the access of “VK” LLC (TIN: 7743001840, OGRN: 1027739850962, 39 Leningradsky Prospekt, building 79, Moscow, 125167) to the Apple Developer Program and App Store Connect web platforms under the user account "VK LLC" (ID: 4D6LA585PP).

**3.** Order the jointly and severally liable defendants — **Apple Inc.** (Registration number 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (Registration number 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE), and **“APPLE RUS” LLC** (TIN: 7707767220, OGRN: 5117746070019, 4 Romanov Pereulok, building 2, floor 6, Premises II, Office 54, Moscow, 125009) to restore the accounts registered to “VK” LLC under the user account "VK LLC" (ID: 4D6LAS85PP) the following applications in the App Store in the form in which they existed before the unlawful removal, with all properties, characteristics, and functionality preserved, under the terms of the Apple Developer Program License Agreement:

**VK:** social network, messenger (Apple ID 564177498);
**Odnoklassniki:** social network (Apple ID 398465290);
**VK Music:** playlists & podcasts (Apple ID 1054372220).

**4.** Order the jointly and severally liable defendants — **Apple Inc.** (Registration number 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (Registration number 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE), and **"APPLE RUS" LLC** (TIN: 7707767220, OGRN: 5117746070019, 4 Romanov Pereulok, building 2, floor 6, Premises II, Office 54, Moscow, 125009) — to restore the full functionality (including the transmission of push notifications) registered for "VK" LLC under the user account "VK LLC" (ID: 4D6LAS85PP) of the following applications installed on users' devices prior to their unauthorized removal from the App Store, under the terms of the Apple Developer Program License Agreement:
**VK:** social network, messenger (Apple ID 564177498);
**Odnoklassniki:** social network (Apple ID 398465290);
**VK Music:** playlists & podcasts (Apple ID 1054372220).

**5.** Order the immediate execution of the judgment.

**6.** In the event of non-compliance with the court judgment, within five days from the date the judicial act is drawn up in full, a judicial penalty shall be recovered — jointly and severally — from **Apple Inc.** (Registration number 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (Registration number 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE), and **"APPLE RUS" LLC** (TIN 7707767220, OGRN: 5117746070019, 4 Romanov Pereulok, building 2, floor 6, Premises II, Office 54, Moscow, 125009) in favor of "VK" LLC (TIN: 7743001840, OGRN: 1027739850962, 39 Leningradsky Prospekt, building 79, Moscow, 125167) a judicial penalty in relation to each of the applications for each day of non-execution of the judicial act, starting from the sixth day from the date of preparation of the judicial act, in full, and until its actual execution in the following amounts:

**VK:** social network, messenger (Apple ID 564177498) — in the amount of 50,000,000 (fifty million) rubles for each day of non-compliance with the judicial act;
**Odnoklassniki:** social network (Apple ID 398465290) — in the amount of 3,000,000 (three million) rubles for each day of non-compliance with the judicial act;
**VK Music:** playlists & podcasts (Apple ID 1054372220) — in the amount of 5,000,000 (five million) rubles for each day of non-compliance with the judicial act;

7. Recover from **Apple Inc.** (Registration number 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (Registration number 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE), and **"APPLE RUS" LLC** TIN: 7707767220, OGRN: 5117746070019, 4 Romanov Pereulok, building 2, floor 6, Premises II, Office 54, Moscow, 125009) in favor of "VK" LLC (TIN: 7743001840, OGRN: 1027739850962, 39 Leningradsky Prospekt, building 79, Moscow, 125167) expenses for payment of state duty in the amount of RUB 200,000.00.

**Appendices (duly certified copies, unless otherwise specified):**

1. Excerpts from the VK annual report for 2025.
2. Apple Developer Program License Agreement.
3. Notarized inspection report of the personal account of VK LLC.
4. Description of the rights and obligations of the parties to the License Agreement.
5. VK press release from June 25, 2026.
6. RBC publication "Apple explains removal of VK apps from App Store" dated June 25, 2026.
7. Ownership structure of “VK” LLC (information from SPARK-Interfax).
8. EU Council Regulation No. 2026/1708 dated July 13, 2026 (with Russian translation and notarized certification of the translator's signature).
9. Extract from the State Register of Accredited Branches and Representative Offices of Foreign Legal Entities regarding the representative office of Apple Distribution International Limited in Moscow.
10. Extract from the Unified State Register of Legal Entities (EGRUL) regarding “APPLE RUS” LLC.
11. Financial statements of “APPLE RUS” LLC for 2025, together with explanatory notes (from the BFO resource).
12. US court decision (Northern District of California) dated January 27, 2025, in Case No. 5:25-cv-00851 (with Russian translation and notarized certification of the translator's signature)
13. Rulings of the Arbitration Court of the City of Moscow dated January 30, 2025 and April 25, 2025 in Case No. A40-126705/2022, and judicial acts of higher courts regarding this separate dispute; judicial acts in Case Nos. A40-24249/2025 and A40-189091/2025.
14. Extract from the Unified State Register of Legal Entities (EGRUL) regarding the Plaintiff.
15. Extract from the Unified State Register of Legal Entities (EGRUL) regarding “VK Management Company” LLC.
16. Extract from the register regarding Apple Inc. (with a Russian translation and notarization of the translator's signature).
17. Extract from the register regarding Apple Distribution International Ltd. (with a Russian translation and notarization of the translator's signature).
18. Proof of service of the statement of claim and its appendices on the persons participating in the case.
19. Proof of payment of the state duty.
20. Power of attorney for the representative.
21. Representative's higher education diploma in law.

Representative of “VK” LLC
under a power of attorney

Хрисанфова А.А.

MORNINGSIDE IP

# TRANSLATOR CERTIFICATION

Date: October 9, 2026

To whom it may concern:

I, Ondrej Recnik, a translator fluent in the Russian and English languages, on behalf of Morningside Translations, do solemnly and sincerely declare that the following is, to the best of my knowledge and belief, a true and correct translation of the document(s) listed below in a form that best reflects the intention and meaning of the original text.

The documents are designated as:

- Apple - VK - Complaint.docx

Ondrej Recnik

Signature

Ondrej Recnik

Print

**В Арбитражный суд города Москвы**
115191, г. Москва, ул. Большая Тульская, д. 17

Истец: **ООО «ВК»**
ИНН 7743001840, ОГРН 1027739850962
125167, г. Москва, пр-кт Ленинградский, д. 39, стр.79

Ответчики: **1. Apple Inc.**
регистрационный номер 806592
One Apple Park Way, Cupertino, California, 95014, USA

**2. Apple Distribution International Ltd.**
регистрационный номер 470672
Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE
**представительство компании «Эппл Дистрибьюшн Интернэшнл Лимитед» в городе Москве**
ИНН 9909463443
125009, г. Москва, вн.тер.г. муниципальный округ Арбат, пер. Романов, д. 4 стр. 2, этаж 6

**3. ООО «ЭППЛ РУС»**
ИНН 7707767220, ОГРН 5117746070019
125009, г. Москва, пер. Романов, д. 4, стр. 2, эт. 6 пом ii ком 54

Госпошлина: 200 000,00 руб.

«18» августа 2026 г.

**Исковое заявление**
**об оспаривании одностороннего отказа от договора**
**и восстановлении нарушенных прав**

Истцу принадлежит программное обеспечение (Приложения VK), распространяемое среди пользователей, пользующихся продукцией Apple, через магазин приложений App Store.

VK — крупнейшая по числу пользователей российская технологическая компания. Пользователи сервисов VK составляют 97% месячной аудитории Рунета (российского сегмента сети «Интернет»), то есть практически все интернет-пользователи России — пользователи продуктов компании[1].

В четвертом квартале 2025 года социальная сеть ВКонтакте насчитала 93,4 млн пользователей в России в месяц, социальная сеть ОК (Одноклассники) – 34 млн пользователей в месяц, информационная платформа Дзен – 67 млн пользователей в квартал, VK клипы – 3,1 млрд среднесуточных просмотров, сервисы Mail – 48,6 млн пользователей в месяц и т.д.[2]

Разработка и размещение приложений в App Store осуществляется на основании Лицензионного соглашения об использовании Apple Developer Program (далее – **Лицензионное соглашение**, приложение № 2). ООО «ВК» присоединилось к Лицензионному соглашению электронным способом путем установки и использования ПО Apple (приложение № 3).

---

[1] См. годовой отчет VK за 2025 год (стр. 6 презентации, приложение № 1).
[2] См. годовой отчет VK за 2025 год (стр. 16, 19, 28, 41 презентации).

Целью Лицензионного соглашения является предоставление компании (Истцу) права пользования программным обеспечением Apple для разработки компанией приложений, работающих на продуктах (устройствах) Apple («Цель», п. 2 Лицензионного соглашения). Разработанные таким образом приложения должны соответствовать требованиям технической документации Apple (п. 3.3), должны получить сертификат (п. 5) и пройти отбор Apple на допуск к распространению в магазине App Store (п. 6). В качестве вознаграждения Apple за предоставление лицензии на ПО компания производит ежегодные платежи (п. 8).

Условия распространения платных и бесплатных приложений в магазине приведены в приложениях 1 и 2 к Лицензионному соглашению. Согласно этим приложениям, в случае бесплатных приложений (приложение № 1 к Лицензионному соглашению) компания назначает Apple Inc. и ее дочернюю компанию (в зависимости от региона, где будут реализовываться приложения) в качестве комиссионера (агента), занимающегося рекламированием, предложением к продаже, получением заказов и организацией доступа конечных пользователей к разработанным компанией приложениям. В случае платных приложений (приложение № 2 к Лицензионному соглашению) комиссионер (агент) также обязуется выставлять счета, собирать с конечных пользователей платежи и перечислять их (за вычетом собственного вознаграждения) компании. Более подробное описание прав и обязанностей сторон по Лицензионном соглашению – см. приложение № 4.

В соответствии с Лицензионным соглашением, для использования программного обеспечения и сервисов Apple в целях разработки и распространения приложений разработчик создает учетную запись (аккаунт разработчика) на веб-платформе **Apple Developer Program** на сайте https://developer.apple.com, с помощью которой получает доступ к основным ресурсам для разработчиков приложений. На данной платформе производится разработка приложений.

Разработчикам предоставляется также доступ к веб-платформе **App Store Connect** на сайте https://appstoreconnect.apple.com, с помощью которой производится управление разработанными приложениями, в том числе их распространение через магазин App Store конечным пользователям. Доступ к данной платформе производится с помощью аккаунта разработчика.

Во исполнение Лицензионного соглашения для доступа к веб-платформам Apple Developer Program и App Store Connect была создана учетная запись **ООО «ВК» – пользователь «VK LLC», ID: 4D6LA585PP**.

За ООО «ВК» были зарегистрированы приложения, допущенные к распространению в App Store:

**VK:** social network, messenger (Apple ID 564177498);
**Odnoklassniki:** Social network (Apple ID 398465290);
**VK Music:** playlists & podcasts (Apple ID 1054372220).

Однако 25 июня 2026 года Ответчики **без какого-либо предварительного уведомления и без объяснения причин**:

**полностью заблокировали** доступ ООО «ВК» к веб-платформе **Apple Developer Program** под учетной записью пользователя «VK LLC» (ID: 4D6LA585PP);

**существенно ограничили** доступ к веб-платформе **App Store Connect** под указанной учетной записью – доступен просмотр только общих сведений о сервисе, включая финансовую информацию, в то время как основная функциональность App Store Connect – управление приложениями, в том числе их распространение через магазин App Store, заблокирована. Указанное свидетельствует о фактической блокировке доступа ООО «ВК» к веб-платформе App Store Connect под указанной выше учетной записью;

**удалили** всю группу приложений VK из магазина App Store;

после удаления Приложений из магазина пользователи уже установленных Приложений **перестали получать push-уведомления** о новых сообщениях, звонках и иных важных событиях, что фактически лишило Приложения существенной части их функционала.

Указанными выше действиями Ответчики существенным образом нарушили права и законные интересы Истца, а также лишили конечных пользователей возможности полноценно пользоваться Приложениями (приложение № 5).

Уже только после ничем не обоснованного удаления Приложений из публичных источников стало известно, что компания Apple ссылается на «соблюдение санкционных правил»[3], несмотря на то, что на тот момент в отношении Истца какие-либо ограничительные меры со стороны США, Евросоюза, Великобритании или иных стран введены не были.

<u>При этом какое-либо обоснование Ответчиками своих действий, адресованное непосредственно Истцу, до настоящего времени так и не поступило</u>.

Участниками ООО «ВК» являются ООО «Компания ВК» (99,95%) и ООО «ИТР» (0,05% ИНН 7714482923), конечным собственником которых является МЕЖДУНАРОДНАЯ КОМПАНИЯ ПУБЛИЧНОЕ АКЦИОНЕРНОЕ ОБЩЕСТВО «ВК» (МКПАО «ВК», VK, ИНН 3900015862) (приложение № 7):




На дату удаления Приложений (25 июня 2026 года) ни одна из перечисленных компаний под санкциями не находилась[4].

В любом случае, многочисленная судебная практика подтверждает, что антироссийские санкции противоречат публичному порядку РФ и не могут выступать в качестве основания для одностороннего отказа от исполнения договорных обязательств (см., например, Определение ВС РФ от 12.03.2024 № 305-ЭС24-669 по делу № А40-138158/2022, постановление Арбитражного суда Московского округа от 09.06.2026 № Ф05-27555/2024 по делу № А40-290187/2023, постановление Арбитражного суда Уральского округа от 25.03.2026 № Ф09-4193/25 по делу № А60-10502/2024 и т.д.).

Таким образом, неправомерный односторонний отказ Ответчиков от исполнения договорных обязательств перед Истцом является основанием для предъявления настоящего иска о признании отказа недействительной сделкой, об обязании Ответчиков восстановить в полном объеме доступ к веб-платформам Apple Developer Program и App Store Connect, восстановить Приложения в магазине App Store, а также восстановить функционал Приложений, уже установленных на устройствах пользователей.

---

[3] https://www.rbc.ru/politics/25/06/2026/6a3d486e9a79474ccbf466ed (РБК, «Apple объяснила удаление приложений VK из App Store» 25.06.2026) (приложение № 6).

[4] Ограничительные меры в отношении МКПАО «ВК» и г-жи Багудиной (генерального директора МКПАО «ВК») были введены 13.07.2026 (приложение № 8).

**Дополнительно, Истец заявляет, что он оставляет за собой право уточнить исковые требования и потребовать взыскания убытков, причиненных незаконным отказом Ответчиков от исполнения Лицензионного соглашения.**

Безусловно, действия Ответчиков причиняют убытки Истцу (в частности, потери по рекламным отношениям). Сумма таких убытков будет определена дополнительно и также предъявлена в адрес Ответчиков к компенсации в рамках настоящего дела на более поздней стадии.

## 1. Обоснование процессуального соучастия на стороне Ответчиков.

Согласно ч. 2 ст. 46 АПК РФ, процессуальное соучастие допускается если:

1) предметом спора являются общие права и (или) обязанности нескольких ответчиков;

2) права и (или) обязанности нескольких ответчиков имеют одно основание;

3) предметом спора являются однородные права и обязанности.

Иными словами, предпосылкой процессуального соучастия является однородный материально-правовой интерес в рассматриваемом деле.

<u>По мнению Истца, действия каждого из Ответчиков были направлены на нарушение его прав, что следует из следующего:</u>

1) Лицензионное соглашение заключено с Apple Inc. (**Ответчик 1**);

2) В соответствии с п. 2 Вкладки А к Приложению 1 и п. 2 Дополнения А к Приложению 2 Лицензионного соглашения, комиссионером Истца, непосредственно занимающимся маркетингом и продажей Приложений Истца в РФ, является Apple Distribution International Ltd. (**Ответчик 2**). **Иными словами, Лицензионное соглашение по факту является трехсторонним и его исполнение со стороны Apple обеспечивается совместными действиями Apple Inc. и Apple Distribution International Ltd.**

3) ООО «ЭППЛ РУС» (**Ответчик 3**) является фактическим представительством Ответчика 1, поскольку полностью контролируется Apple Inc. (через Apple Distribution International Ltd. (доля 99,5%) и Apple Operations International Ltd. (доля 0,5%), приложение № 10) и фактически осуществляет деятельность Apple Inc. на территории РФ.

Согласно ЕГРЮЛ, ООО «ЭППЛ РУС» занимается оптовой торговлей компьютерами, периферийными устройствами к компьютерам и программным обеспечением (код 46.51), консультативной деятельностью и работами в области компьютерных технологий (код 62.02), а также рекламной деятельностью (код 73.11). Согласно пояснениям в бухгалтерской отчетности общества за 2025 год, Apple Inc. является материнской компанией ООО «ЭППЛ РУС», а основная кредиторская задолженность ООО «ЭППЛ РУС» – задолженность перед Эппл Дистрибьюшн Интернешнл по закупкам у него товаров (приложения №№ 10, 11).

Таким образом, фактически исполнение обязанностей Apple по Лицензионному соглашению в части маркетинга и реализации Приложений Истца в российском сегменте магазина App Store, а также реализации Приложений Истца конечным пользователям на территории РФ осуществлялось всеми Ответчиками совместно, в том числе ООО «ЭППЛ РУС».

Практика, подтверждающая возможный солидаритет локальной компании и ее статус фактического представительства, где суды пришли к аналогичным выводам в отношении ООО «Гугл»: постановление АС Московского округа от 22.01.2024 № Ф05-28458/2022 по делу № А40-126705/2022, а также судебные акты в делах №№ А40-155367/2020, А40-74815/2022, А40-

74085/2022, А40-97559/2022, А40-98239/2022. Так, в деле № А40-155367/2020 было установлено следующее:

> *«В соответствии со ст. 322 ГК РФ солидарная обязанность (ответственность) или солидарное требование возникает, если солидарность обязанности или требования предусмотрена договором или установлена законом, в частности при неделимости предмета обязательства.*
>
> *Google LLC (США) является головной компанией группы компаний Google, которая владеет Google Ireland Limited (Ирландия) и опосредованно ООО «Гугл».*
>
> *Из представленных доказательств следует, что невозможно разделить требование истца к каждому из соответчиков, а потому солидарное требование является обоснованным.*
>
> *ООО «Гугл» является фактическим подразделением Google LLC на территории РФ. На официальном сайте www.google.com ООО «Гугл» указано в качестве офиса Google в России (т. 2, л.д. 50-53). То есть, для группы компаний ответчиков ООО «Гугл» выполняет функции российского подразделения.*
>
> *Основной деятельностью ООО «Гугл» согласно Общероссийскому классификатору видов экономической деятельности является «73.11 Деятельность рекламных агентств», в частности предоставление всех видов услуг в области рекламы. В группе компаний Google она реализуется через сервис Google Ads. Суд отмечает, что предметом договора-счета является предоставление истцу доступа к Google Ad Manager. На сайте компании Google Ad Manager назван сервисом, относящимся к Google Ads, Ad Sense и т.д.*
>
> *Таким образом, услуги, оказываемые ООО «Гугл» и Google Ireland Limited (Ирландия) по договору-счету, невозможно разделить. Если перечисление денежных средств от пользования сервисом осуществляется от Google Ireland Limited (Ирландия), то техническое и клиентское обслуживание сервиса, поиск и работа с рекламодателями на территории РФ осуществляется ООО «Гугл». Как утверждается истцом и не опровергается ответчиками, именно ООО «Гугл» комментировало в СМИ ситуацию вокруг блокировки аккаунта истца. Доказательства обратного ответчики не предоставили.*
>
> *Заключение договора-счета от 30.12.2019 г. невозможно было без наличия у истца аккаунта Google, т.е. без заключения договора с Google LLC (США). Об этом ответчики сами указывают в своих письменных объяснениях (т. 12, л.д. 49-51). Google LLC (США) и Google Ireland Limited (Ирландия) входят в одну группу компаний, основная деятельность которой направлена на предоставление пользователям различных интернет-сервисов.*
>
> *В ходе анализа обстоятельств дела судом установлено, что действия ответчиков согласованы, они использую один и тот же инструментарий для оказания услуг (единое программное обеспечение, политику оказания услуг и т.д.), а потому исковые требования по отношению к ним принципиально неделимы, что является основанием для возложения на них солидарной обязанности по возобновлению доступа истца к аккаунту и сервисам Google и возобновлению действия расторгнутых договоров».*

Таким образом, Истец считает, что его требования должны рассматриваться против всех трех солидарных Ответчиков, которые содействовали нарушению его прав и совместно (солидарно) отвечают за допущенные нарушения.

**2. Соблюдение претензионного порядка урегулирования спора (ч. 5 ст. 4 АПК РФ)**

Досудебный порядок урегулирования спора по требованиям об оспаривании одностороннего отказа от договора и о восстановлении его действия нормами АПК РФ не предусмотрен (п. 29 Постановления Пленума Верховного Суда РФ от 22.06.2021 № 18 «О некоторых вопросах досудебного урегулирования споров, рассматриваемых в порядке гражданского и арбитражного судопроизводства»).

**3. Подсудность спора настоящему суду**

**3.1. Недействительность пророгационного соглашения**

По смыслу статьи 252 АПК РФ, при наличии пророгационного соглашения о передаче спора в компетентный суд иностранного государства арбитражный суд Российской Федерации оставляет исковое заявление, заявление без рассмотрения, если любая из сторон не позднее дня представления своего первого заявления по существу спора в арбитражном суде первой инстанции заявит по этому основанию возражение в отношении рассмотрения дела в арбитражном суде Российской Федерации, за исключением случаев, если арбитражный суд установит, что пророгационное соглашение недействительно, утратило силу, не может быть исполнено или не предусматривает исключение компетенции арбитражных судов Российской Федерации (часть 5 статьи 3, пункт 5 части 1 статьи 148 АПК РФ). Указанные правила применяются вне зависимости от того, находится ли в производстве иностранного суда дело по спору между сторонами пророгационного соглашения (п. 11 Постановления Пленума Верховного Суда РФ от 27.06.2017 № 23 «О рассмотрении арбитражными судами дел по экономическим спорам, возникающим из отношений, осложненных иностранным элементом».

**3.1.1.** По мнению Истца, несмотря на наличие в Лицензионном соглашении пророгационной оговорки в пользу судов Северного округа штата Калифорния (п. 14.10 Лицензионного соглашения), настоящий спор подлежит рассмотрению арбитражными судами Российской Федерации, так как эта пророгационная оговорка ничтожна и в любом случае не может быть исполнена.

Недействительность (невозможность исполнения) пророгационной оговорки следует из того факта, что американский государственный суд по месту нахождения головного офиса корпорации Apple, вне всяких сомнений, будет применять американское санкционное право, противоречащее публичному порядку РФ и иным сверхимперативным нормам российского права.

Так, именно данный суд Северного округа штата Калифорнии в целях поддержки другого представителя американского бигтеха – корпорации Google (Alphabet) вынес очевидно незаконное решение о том, что только американский суд может рассматривать спор о привлечении к субсидиарной ответственности в рамках банкротства российской компании ООО «Гугл» и об оспаривании сделки российского должника с ирландской компанией группы Google (приложение № 12), несмотря на то, что до вынесения указанного решения российский суд как в рамках самого дела о банкротстве (№ А40-126705/2022), так и в рамках отдельных споров (дела №№ А40-24249/2025, А40-189091/2025) прямо запрещал продолжение такого разбирательства со ссылками на положения об исключительной компетенции российских банкротных судов (судебные акты – приложение № 13).

**3.1.2.** Дополнительно следует отметить, что, как указывалось выше, Лицензионное соглашение было подписано Истцом путем присоединения, то есть способом, не позволяющим Истцу повлиять на содержание подписываемого документа, в том числе в части выбора компетентного суда.

Соответственно, при присоединении к Лицензионному соглашению Истец не имел возможности изъявить свою волю в отношении передачи споров на рассмотрение в американский суд, что является основанием для признания пророгационного соглашения неисполнимым.

Как отметил АС Московского округа в постановлении от 18.12.2024 № Ф05-27555/2024 по делу № А40-290187/2023:

*«Из буквального содержания п. 5 ч. 1 ст. 148 АПК РФ следует, что исковое заявление может быть оставлено без рассмотрения только в том случае, когда имеется соглашение сторон о рассмотрении данного спора другим судом.*

*Согласно п. 5 ч. 1 ст. 148 АПК РФ исключением является случай, когда соглашение не может быть исполнено.*

*Из положений п. п. 1, 3, 6 Информационного письма Президиума ВАС РФ от 09.07.2013 N 158 применительно к обстоятельствам настоящего дела следует, что при разрешении вопроса о действительности пророгационного соглашения подлежит установлению обстоятельство, была ли воля сторон направлена на разрешение спора в судах Англии.*

*В п. 8 Постановления Пленума Верховного Суда РФ от 27.06.2017 N 23 сказано, что под исполнимым пророгационным соглашением понимается соглашение, на основании которого возможно установить истинное намерение (действительную волю) сторон в отношении компетенции арбитражного суда Российской Федерации.*

*В п. 30 Постановления Пленума Верховного Суда РФ от 10.12.2019 N 53 сказано, что под неисполнимым арбитражным соглашением понимается такое соглашение, из содержания которого не может быть установлена воля сторон в отношении выбранной ими процедуры арбитража (например, невозможно установить, осуществлен ли выбор определенного институционального арбитража или арбитража ad hoc) или которое не может быть исполнено в соответствии с волей сторон (например, согласованное арбитражное учреждение не вправе осуществлять администрирование арбитража в соответствии с требованиями применимого права).*

*Применительно к ч. 5 ст. 3 АПК РФ апелляционный суд считает допустимым применить к настоящему спору положения п. 8 Постановления Пленума Верховного Суда РФ от 27.06.2017 N 23 и п. 30 Постановления Пленума Верховного Суда РФ от 10.12.2019 N 53.*

*Как изложено выше, лицензионное соглашение не было заключено непосредственно между истцом и ответчиком.*

***Предоставление доступа к программному обеспечению Cisco в силу лицензионного соглашения с конечным пользователем осуществляется через сайт правообладателя Cisco, посредством ключей активации (последовательность символов) в личном кабинете на сайте https://id.cisco.com/.***

***Лицензионное соглашение считается подписанным между истцом и ответчиком в момент активации истцом (конечный пользователь) в личном кабинете сервисных контрактов Cisco.***

***По мнению апелляционного суда, при таких обстоятельствах истец не мог повлиять на содержание лицензионного соглашения, в т.ч. на положение п. 12.9. о рассмотрении споров в судах Англии.***

***У истца не было воли на заключение пророгационного соглашения о рассмотрении споров в судах Англии, поскольку он стал участником лицензионного соглашения автоматически (путем активации).***

*На основании изложенного, апелляционный суд пришел к верному выводу, что пророгационное соглашение (п. 12.9. лицензионного соглашения) является неисполнимым, поскольку отсутствует истинное намерение (действительная воля) истца на передачу споров в суды Англии».*

При недействительности / неисполнимости пророгационного соглашения подлежат применению общие нормы АПК РФ об определении подсудности (пункты 1-4 ч. 1 ст. 247 АПК РФ).

**3.2. На территории РФ функционирует представительство Ответчика 2**

Согласно п. 2 ч. 1 ст. 247 АПК РФ, арбитражные суды в РФ рассматривают дела по экономическим спорам с участием иностранных лиц в случае, если орган управления, филиал или представительство иностранного лица находится на территории Российской Федерации.

Apple Distribution International Ltd. является одной из немногих технологических компаний, которые возложили на специальные юридические лица, созданные ими на территории РФ по российскому праву (подразделения иностранных юридических лиц), выполнение обязательств, предусмотренных ФЗ от 01.07.2021 № 236-ФЗ «О деятельности иностранных лиц в информационно-телекоммуникационной сети «Интернет» на территории Российской Федерации» (далее – Закон № 236-ФЗ).

Согласно ст. 7 Закона № 236-ФЗ, такое российское юридическое лицо, среди прочего, осуществляет прием и рассмотрение обращений российских граждан, организаций к иностранному лицу, осуществляющему деятельность в сети «Интернет» на территории Российской Федерации, исполнение решений судов, решений (требований) государственных органов Российской Федерации, принятых в отношении такого иностранного лица, **а также представление интересов иностранного лица, осуществляющего деятельность в сети «Интернет» на территории Российской Федерации, в судах.**

Функции такого российского юридического лица выполняет представительство компании «ЭППЛ ДИСТРИБЬЮШН ИНТЕРНЭШНЛ ЛИМИТЕД» в Москве (приложение № 9).

Место нахождения представительства – город Москва. Соответственно, спор подлежит рассмотрению в Арбитражном суде города Москвы.

**3.3. Лицензионное соглашение исполнялось преимущественно на территории России**

Приложения Истца разработаны преимущественно для распространения среди российских граждан на территории РФ (место исполнения Лицензионного соглашения, п. 3 ч. 1 ст. 247 АПК РФ).

Согласно годовому отчету VK за 2025 год (стр. 17 презентации, приложение № 1), в 4 квартале 2025 средняя месячная аудитория ВКонтакте в РФ достигла 93,4 млн пользователей, а по всему миру – 109,2 млн человек.

Именно в РФ Истцу были причинены наибольшие убытки из-за безосновательного отказа Ответчиков от исполнения своих обязательств.

И именно на территории РФ наступил наибольший причиненный действиями Ответчиков вред в виде отсутствия у пользователей доступа к Приложениям и к их полному функционалу.

**3.4. На территории РФ находится имущество иностранного Ответчика 1 (в лице его фактического представительства – Ответчика 3)**

Согласно п. 1 ч. 1 ст. 247 АПК РФ, арбитражные суды в РФ рассматривают дела по экономическим спорам с участием иностранных лиц в случае, если на территории РФ находится имущество ответчика.

Как упоминалось выше, на территории РФ Ответчик 1 представлен принадлежащим ему российским юридическим лицом – Ответчиком 3 ООО «ЭППЛ РУС». Согласно сведениям БФО, на конец 2025 года у Ответчика 3 имелись денежные средства на счетах в сумме 190,5 млн руб., а также дебиторская задолженность в размере 2,5 млрд руб. (приложение № 11).

Как упоминалось выше, ООО «ЭППЛ РУС» полностью контролируется Apple Inc. и фактически осуществляет деятельность Apple Inc. на территории РФ – согласно ЕГРЮЛ, ООО «ЭППЛ РУС» занимается оптовой торговлей компьютерами, периферийными устройствами к компьютерам и программным обеспечением (код 46.51), консультативной деятельностью и работами в области компьютерных технологий (код 62.02), а также рекламной деятельностью (код 73.11).

Таким образом, исполнение обязанностей Apple по Лицензионному соглашению в части маркетинга (продвижения) Приложений Истца в российском сегменте магазина App Store, а

также реализации Приложений Истца конечным пользователям на территории РФ осуществлялось всеми Ответчиками совместно, в том числе ООО «ЭППЛ РУС».

Касательно выводов о том, что локальное юридическое лицо при сходных фактических обстоятельствах следует рассматривать как фактическое представительство – см. постановление АС Московского округа от 22.01.2024 № Ф05-28458/2022 по делу № А40-126705/2022, а также судебные акты в делах №№ А40-155367/2020, А40-74815/2022, А40-74085/2022, А40-97559/2022, А40-98239/2022, где суды пришли к аналогичным выводам в отношении ООО «Гугл». Так, в решении по делу № А40-155367/2020 было установлено следующее:

*«ООО «Гугл» является фактическим подразделением Google LLC на территории РФ. На официальном сайте www.google.com ООО «Гугл» указано в качестве офиса Google в России (т. 2, л.д. 50-53). То есть, для группы компаний ответчиков ООО «Гугл» выполняет функции российского подразделения.*

*Основной деятельностью ООО «Гугл» согласно Общероссийскому классификатору видов экономической деятельности является «73.11 Деятельность рекламных агентств», в частности предоставление всех видов услуг в области рекламы. В группе компаний Google она реализуется через сервис Google Ads. Суд отмечает, что предметом договора-счета является предоставление истцу доступа к Google Ad Manager. На сайте компании Google Ad Manager назван сервисом, относящимся к Google Ads, Ad Sense и т.д.».*

**3.5.** При этом Истец отмечает, что им заявлены требования к Ответчикам – трем солидарным должникам, два из которых находятся в РФ (Ответчик 2 и Ответчик 3).

В силу солидарности обязательств на стороне Ответчиков подсудность настоящего спора Арбитражному суду города Москвы определена по выбору Истца на основании ст. 247 АПК РФ с учетом положений ч. 2 ст. 36 АПК РФ, т.е. по месту нахождения одного из ответчиков по выбору истца, по аналогии закона, что соответствует судебной практике:

*«АО "Колхоз им. Бекерева" обратилось с исковым заявлением о взыскании с Zeppelin Power Systems GmbH реального ущерба в размере 275 148 005,41 рублей, 520 352,37 долларов США и упущенной выгоды в размере 64 845 666,46 рублей, причиненных истцу при выполнении Zeppelin Power Systems GmbH шеф-монтажных услуг по ремонту дизельного двигателя MaK 6M32 (серийный номер 637079) в объеме 90 000 моточасов.*

*Определением Арбитражного суда Московской области от 25.04.2024 по ходатайству истца к участию в деле в качестве соответчика в порядке ст. 46 АПК РФ привлечено ООО "Цеппелин Пауэр Системс Русланд", истец в соответствии со ст. 49 АПК РФ уточнил исковые требования и просил взыскать суммы причиненного убытка солидарно с Zeppelin Power Systems GmbH и ООО "Цеппелин Пауэр Системс Русланд".*

*(...) В соответствии с частью 2 статьи 36 АПК РФ иск к ответчикам, находящимся или проживающим на территориях разных субъектов Российской Федерации, предъявляется в арбитражный суд по месту нахождения или месту жительства одного из ответчиков.*

*Согласно части 5 статьи 3 АПК Российской Федерации в случае отсутствия нормы процессуального права, регулирующей отношения, возникшие в ходе судопроизводства в арбитражных судах, суды применяют норму, регулирующую сходные отношения (аналогия закона), а при отсутствии такой нормы действуют исходя из принципов осуществления правосудия в России (аналогия права).*

*Учитывая изложенное, подсудность спора в данном случае должна решаться на основании ч. 2 ст. 36 АПК РФ с учетом положений ст. ст. 247, 248.1 АПК РФ, т.е. по месту нахождения одного из ответчиков по выбору истца по аналогии закона.*

*В условиях действующих ограничительных мер в отношении Российской Федерации и российских юридических лиц возможности истца по защите своих прав и экономических интересов существенно ограничены, учитывая, что фактически защита прав и интересов заявителя в настоящее время может осуществляться исключительно в пределах*

*территории и юрисдикции Российской Федерации, истец, обращаясь по подсудности в Арбитражный суд Московской области в порядке ст. ст. 247, 248.1 АПК РФ, правомерно воспользовался своим правом выбора подсудности, предъявив иск по месту нахождения второго ответчика (ООО "Цеппелин Пауэр Системс Русланд").*

*Учитывая, что фактически защита прав и интересов заявителя в настоящее время может осуществляться исключительно в пределах территории и юрисдикции Российской Федерации, а выводы суда первой инстанции в отношении представительства сделаны без оценки позиции изложенной в п. 9 Информационного письма Президиума Высшего Арбитражного Суда Российской Федерации от 09.07.2013 N 158, оснований для передачи дела по подсудности не имелось».*

(постановление 10ААС от 19.09.2024 № 10АП-16581/2024, 10АП-16582/2024 по делу № А41-69832/2022, оставлено без изменения вышестоящими инстанциями)

**4. Применимое право.**

Согласно п. 14.10 Лицензионного соглашения, при разрешении споров подлежит применению право США и штата Калифорния. Вместе с тем, Истец считает, что оговорка о праве не исполнима, а при разрешении данного спора подлежат применению нормы российского права.

Так, американское право содержит санкционные нормы, которые, согласно открытым источникам, послужили основанием для удаления Приложений из App Store и одностороннего отказа от Лицензионного соглашения.

В то же время экономические санкции иностранного государства не могут выступать в качестве основания для нарушения прав российского юридического лица, в том числе посредством одностороннего отказа от договоров, поскольку экономические санкции противоречат публичному порядку Российской Федерации и не подлежат применению на ее территории в силу прямого указания закона.

Согласно ст. 1193 ГК РФ, норма иностранного права, подлежащая применению в соответствии с правилами раздела VI ГК РФ, в исключительных случаях не применяется, когда последствия ее применения явно противоречили бы основам правопорядка (публичному порядку) Российской Федерации.

Согласно абз. 5 п. 1 Информационного письма Президиума ВАС РФ от 26.02.2013 № 156, публичным порядком являются фундаментальные правовые начала (принципы), которые обладают высшей императивностью, универсальностью, особой общественной и публичной значимостью, составляют основу построения экономической, политической, правовой систем государства. К таким началам, в частности, относится запрет на совершение действий, прямо запрещенных сверхимперативными нормами законодательства Российской Федерации, если этими действиями наносится ущерб суверенитету или безопасности государства, затрагиваются интересы больших социальных групп, нарушаются конституционные права и свободы частных лиц.

В ч. 1 ст. 1 ФЗ от 04.06.2018 № 127-ФЗ «О мерах воздействия (противодействия) на недружественные действия Соединенных Штатов Америки и иных иностранных государств» экономические санкции в отношении Российской Федерации, ее граждан или российских юридических лиц отнесены к числу недружественных действий США, представляющих угрозу территориальной целостности Российской Федерации, и направленных на ее экономическую и политическую дестабилизацию.

На незаконность действий, связанных с применением экономических санкций иностранных государств, указал и Конституционный Суд РФ. Так, согласно Постановлению от 13.02.2018 № 8-П не подлежит судебной защите право, реализация которого правообладателем обусловлена следованием режиму санкций против Российской Федерации, ее хозяйствующих субъектов,

которые установлены каким-либо государством вне надлежащей международно-правовой процедуры и в противоречии с многосторонними международными договорами, участником которых является РФ.

Указанное подтверждается последовательной судебной практикой, в частности судебными актами всех инстанций по делам № А40-155367/2020, № А40-132383/2021, № А82-8396/2024 и ряду других дел.

Например, в решении АСгМ от 20.04.2021 по делу № А0-155367/2020 суд указал:

*«Санкции, примененные в отношении К.В. Малофеева, а как следствие истца, являются нормами публичного права США и ЕС, т.е. представляют собой предписания иностранных властных органов о наложении ряда публично-правовых ограничений прав и обязанностей частных лиц. Публичное право не обладает экстерриториальным характером, а потому санкционное законодательство США и ЕС не порождает прав и не налагает обязанностей на российских граждан и юридических лиц, что соответствует фундаментальным принципам о недопустимости вмешательства во внутренние дела государств и суверенитета государств (Декларация о недопустимости вмешательства во внутренние дела государств, об ограждении их независимости и суверенитета, принята на Генеральной Ассамблее ООН резолюцией 2131 (XX) от 21 декабря 1965 года)».*

Также из постановления АС Московского округа от 24.04.2026 № Ф05-965/2026 по делу № А40-148095/2024:

*«В соответствии с пунктом 1 статьи 1210 Гражданского кодекса Российской Федерации стороны договора могут при заключении договора или в последующем выбрать по соглашению между собой право, которое подлежит применению к их правам и обязанностям по этому договору.*

*Согласно статье 1193 Гражданского кодекса Российской Федерации норма иностранного права, подлежащая применению в соответствии с правилами раздела VI Гражданского кодекса Российской Федерации, в исключительных случаях не применяется, когда последствия ее применения явно противоречили бы основам правопорядка (публичному порядку) Российской Федерации с учетом характера отношений, осложненных иностранным элементом. В этом случае при необходимости применяется соответствующая норма российского права.*

*Суды обоснованно исходили из того, что экономические санкции, введенные иностранными государствами в отношении российских юридических лиц и используемые в качестве основания ограничения прав такого лица, не подлежат учету судом при разрешении спора на территории Российской Федерации, в том числе с учетом положений части 1 статьи 1 Федерального закона от 04.06.2018 N 127-ФЗ "О мерах воздействия (противодействия) на недружественные действия Соединенных Штатов Америки и иных иностранных государств", а также статьи 1193 Гражданского кодекса Российской Федерации. В настоящем деле установлено, что блокировка указанного аккаунта осуществлена ответчиками со ссылкой на международные санкции. Как указано выше, ответчики не представили доказательств того, что блокировка обусловлена нарушением истцом условий договора или правил использования сервиса.*

*При таких обстоятельствах применение к спорным отношениям норм иностранного права, которое допускает ограничение прав российского юридического лица на основании санкционных ограничений, противоречащих публичному порядку Российской Федерации, привело бы к результату, несовместимому с основами правопорядка Российской Федерации. В этой связи суды правомерно применили оговорку о публичном порядке и отказали в удовлетворении ходатайства о назначении судебной экспертизы для установления содержания норм английского права, поскольку применение таких норм в любом случае было бы невозможно в силу их противоречия публичному порядку Российской Федерации».*

Таким образом, поскольку оговорки о применимом праве отсылают к правовым нормам, последствия применения которых противоречат публичному порядку РФ, единственным правом для обеспечения баланса интересов сторон спора является российское, как право юрисдикции, в которой непосредственно осуществляется распространение Ответчиками Приложений Истцов, то есть где происходит исполнение, имеющее решающее значение для Лицензионного соглашения (ст.ст. 1186, 1211 ГК РФ).

**5. Уведомление иностранных Ответчиков.**

В силу п. 32 Постановления Пленума Верховного Суда РФ от 27.06.2017 № 23 «О рассмотрении арбитражными судами дел по экономическим спорам, возникающим из отношений, осложненных иностранным элементом» (далее – **Пленум № 23**), по смыслу положений части 2 статьи 253 АПК РФ, пункта 3 статьи 54 ГК РФ, если на территории РФ находится представитель иностранного лица, уполномоченный на получение извещения о судебном разбирательстве и иных судебных документов, последние направляются в общем порядке, предусмотренном статьями 121, 123 АПК РФ, по адресу такого представителя. В этом случае направление судебных документов по адресу стороны в иностранном государстве не требуется.

Таким образом, направление документов в адрес представительства Ответчика 2 в Москве является его надлежащим уведомлением (приложение № 18).

Истец также направил иск и приложения к нему на иностранный адрес Ответчика 1 с использованием услуг курьерской службы EMS (приложение № 18).

В целях содействия правосудию Истец предлагают суду перенести на него обязанность по надлежащему уведомлению Ответчиков о начавшемся судебном процессе.

Истец намерен перевести надлежащим образом заверенные судом копии определений Арбитражного суда города Москвы о назначении судебного заседания на английский язык, являющийся государственным языком страны инкорпорации Ответчика 1 (с нотариальным удостоверением подлинности подписи переводчика), и направить их на адрес Ответчика 1, указанный в его регистрационных документах, используя услуги EMS, DHL или иной аналогичной курьерской службы.

Истец полагает, что такое направление будет являться надлежащим уведомлением иностранного Ответчика 1 о настоящем разбирательстве, а также допустимым средством процессуальной экономии, направленным на минимизацию затягивания рассмотрения дела. Возможность такого механизма уведомления иностранных участников арбитражного процесса подтверждается судебной практикой:

Постановление АС Московского округа от 05.12.2018 № Ф05-18565/2018 по делу № А40-216909/2017:

*«23.01.2018 ЗАО "ФЦСР" в целях содействия Арбитражному суду города Москвы посредством услуг DHL направило по адресу Компании Позитив Резолв Лимитед определение Арбитражного суда города Москвы от 10.01.2018 по делу N А40-216909/17 с нотариально заверенным переводом на английский язык (номер транспортной накладной 9016504254).*

*Согласно выписке отслеживания грузов DHL express документы были доставлены по назначению 30.01.2018. В получении расписался Isalene Cuffy.*

*При указанных обстоятельствах, суд апелляционной инстанции правомерно указал, что требования ст. 121 АПК РФ и статьи 10 Конвенции о вручении за границей судебных и внесудебных документов по гражданским и торговым делам (подписана в Гаага, 15.11.1965) соблюдены, и Компания Позитив Ризолв Лимитед была надлежащим образом извещена и имела возможность воспользоваться своими процессуальными правами на участие в деле».*

В постановлении 13ААС от 25.02.2026 № 13АП-30952/2025 по делу № А56-71206/2024 указано:

*«Суд апелляционной инстанции отклоняет также довод апелляционной жалобы о ненадлежащем извещении Ответчиков.*

*Как верно указал суд, вопросы вручения за границей судебных документов регулируются Конвенцией о вручении за границей судебных и внесудебных документов по гражданским или торговым делам (заключена в г. Гааге 15.11.1965, далее - "Конвенция"). Российская Федерация и Соединенные Штаты Америки являются договаривающимися сторонами по Конвенции.*

*Как разъясняется в Информации Минюста России "О порядке составления и исполнения запросов о вручении документов и получении доказательств по гражданским или торговым делам в рамках Конвенции о вручении за границей судебных и внесудебных документов по гражданским или торговым делам 1965 года, Конвенции о получении доказательств по гражданским или торговым делам 1970 года и Конвенции по вопросам гражданского процесса 1954 года", Российской Федерацией при присоединении к Конвенции было сделано заявление о том, что взыскание любым государством-участником Конвенции сборов за вручение документов будет рассматриваться Российской Федерацией как отказ от применения данной Конвенции в отношении России, и, соответственно, Российская Федерация не будет применять Конвенцию в отношении такого государства-участника. Такие сборы были введены США, в связи с чем при вручении российских судебных документов лицам, находящимся на территории США, правила Конвенции о вручении не применяются. В сложившейся ситуации теоретически сохраняется возможность направления судебных и внесудебных документов напрямую ответчику посредством заказного письма, что, согласно информации, предоставленной Государственным департаментом США, не противоречит американскому законодательству.*

*Судом установлено, что истец доставил в адрес ответчиков посредством курьерской службы определение суда о принятии искового заявления к рассмотрению, определения суда о назначении судебного заседания, а также исковое заявление, сопровождаемые нотариально заверенными переводами на английский язык, что свидетельствует о надлежащем извещении ответчиков».*

Соответственно, в целях экономии ресурсов суда и сокращения времени на разрешение спора с учетом загрузки АС города Москвы, Истец готов взять на себя обязанность по уведомлению Ответчиков путем направления нотариально заверенных копий переведенных на английский язык определений о назначении судебного заседания на адрес регистрации Ответчика 1 с использованием услуг перевозчика DHL или иной аналогичной курьерской службы.

С учетом изложенного Истец просит суд назначить предварительное заседание по настоящему делу с учетом стандартных сроков рассмотрения дела и графика суда без предоставления дополнительного времени для уведомления иностранных участников процессов через Министерство юстиции Российской Федерации[5].

## 6. Правовое обоснование исковых требований

### 6.1. Ответчики безосновательно отказались от исполнения Лицензионного соглашения в прямое нарушение своих обязанностей из него

В п. 2.1 Лицензионного соглашения установлено, что доступ компании к сервисам Apple осуществляется через открытый для нее аккаунт разработчика, вход в который осуществляется с использованием продуктов Apple, в частности, App Store Connect.

[5] Участие иностранных лиц в деле само по себе не означает, что дело является особо сложным, и поэтому не предполагает продления срока рассмотрения дела до шести месяцев на основании части 2 статьи 152 АПК РФ (абз. 2 п. 29 Пленума № 23).

Согласно п. 7 Лицензионного соглашения, разработанные компанией приложения, соответствующие требованиям документации Apple, прошедшие отбор и получившие цифровую подпись Apple (в порядке пунктов 5 и 6 Лицензионного соглашения), распространяются, в том числе, через магазин App Store.

В силу п. 1.1 Приложения № 1 к Лицензионному соглашению, компания назначает Ответчиков в качестве своих комиссионеров, в чьи обязанности входит рекламирование Приложений Истца, предложение их к продаже, сбор платежей с конечных пользователей и предоставление доступа пользователей к копиям Приложений для их загрузки.

Однако, как упоминалось ранее, 25 июня 2026 года Приложения Истца были без какого-либо обоснования удалены из магазина App Store, что привело к тому, что:

- Приложения Истца перестали быть доступными для скачивания пользователями;
- Истец перестал получать причитающиеся ему платежи от пользователей;
- Истцу был заблокирован доступ к веб-платформам Apple Developer Program и App Store Connect под его учетными записями;

что является явным нарушением Ответчиками положений Лицензионного соглашения и Приложений № 1 и № 2 к нему.

Также, согласно Дополнению 1 к Лицензионному соглашению, Apple предоставляет компании сервис push-уведомлений Apple (APN) для использования с Приложениями. Компания вправе использовать сервис APN в целях отправки push-уведомлений в свои Приложения (п. 1.2 Дополнения 1).

Тем не менее, начиная с 25 июня 2026 года, функционал Приложений Истца, установленных на устройствах пользователей, существенно ограничен – в них более не доставляются push-уведомления, т.е. Ответчики в одностороннем порядке перестали оказывать сервис push-уведомлений Apple (APN).

Обязательства должны исполняться надлежащим образом в соответствии с условиями обязательства и требованиями закона (ст. 309 ГК РФ). Удаление Ответчиками Приложений Истца из магазина App Store, прекращение сервиса push-уведомлений, блокировка платежей, блокировка доступа к веб-платформам Apple Developer Program и App Store Connect является явным нарушением обязанностей Ответчиков по Лицензионным соглашениям.

**6.2. Необоснованный односторонний отказ от исполнения Лицензионных соглашений является ничтожным**

При осуществлении стороной права на одностороннее изменение условий обязательства или односторонний отказ от его исполнения она должна действовать разумно и добросовестно, учитывая права и законные интересы другой стороны (пункт 3 статьи 307, пункт 4 статьи 450.1 ГК РФ).

Нарушение этой обязанности может повлечь отказ в судебной защите названного права полностью или частично, в том числе признание ничтожным одностороннего изменения условий обязательства или одностороннего отказа от его исполнения (пункт 2 статьи 10, пункт 2 статьи 168 ГК РФ) (п. 14 Постановления Пленума Верховного Суда РФ от 22.11.2016 № 54 «О некоторых вопросах применения общих положений Гражданского кодекса Российской Федерации об обязательствах и их исполнении»).

Предоставленное законом или договором право на односторонний отказ от договора (исполнения договора) может быть осуществлено управомоченной стороной путем уведомления другой стороны об отказе от договора (исполнения договора). Договор прекращается с момента

получения данного уведомления, если иное не предусмотрено законом или договором (п. 1 ст. 450.1 ГК РФ). Направление уведомления предусмотрено и п. 11.2 Лицензионного соглашения.

**С учетом подлежащего применению российского права расторжение договора между Истцом и Ответчиками в одностороннем порядке могло быть только мотивированным.**

**Вместе с тем, на дату подачи настоящего иска Ответчики не дали Истцу официального обоснования своего одностороннего отказа. Более того, в адрес Истца от Ответчиков в принципе не поступало какого-либо уведомления.**

Какие-либо доказательства нарушения Истцом условий Лицензионного соглашения Ответчиками не представлены, основания для отказа от исполнения договора отсутствуют.

Таким образом, такой необоснованный отказ является ничтожной сделкой, которая не влечет юридических последствий (ст.ст. 167, 168 ГК РФ).

**6.3. Отказ Ответчиков от исполнения Лицензионного соглашения по санкционным основанием является недействительным**

В любом случае, экономические санкции иностранного государства не могут выступать в качестве основания для нарушения прав российского юридического лица, в том числе посредством одностороннего отказа от договора, поскольку экономические санкции противоречат публичному порядку РФ и не подлежат применению на ее территории в силу прямого указания закона.

Согласно ст. 1193 ГК РФ, норма иностранного права, подлежащая применению в соответствии с правилами раздела VI ГК РФ, в исключительных случаях не применяется, когда последствия ее применения явно противоречили бы основам правопорядка (публичному порядку) РФ.

Содержание понятия «публичный порядок» разъяснено в абз. 5 п. 1 Информационного письма Президиума ВАС РФ от 26.02.2013 № 156, согласно которому под публичным порядком понимаются фундаментальные правовые начала (принципы), которые обладают высшей императивностью, универсальностью, особой общественной и публичной значимостью, составляют основу построения экономической, политической, правовой системы государства.

К таким началам, в частности, относится запрет на совершение действий, прямо запрещенных сверхимперативными нормами законодательства РФ, если этими действиями наносится ущерб суверенитету или безопасности государства, затрагиваются интересы больших социальных групп, нарушаются конституционные права и свободы частных лиц.

В ч. 1 ст. 1 ФЗ от 04.06.2018 № 127-ФЗ «О мерах воздействия (противодействия) на недружественные действия Соединенных Штатов Америки и иных иностранных государств» экономические санкции в отношении РФ, ее граждан или российских юридических лиц отнесены к числу недружественных действий США, представляющих угрозу территориальной целостности РФ и направленных на ее экономическую и политическую дестабилизацию.

Арбитражная практика также подтверждает вывод о недопустимости применения иностранных экономических санкций в силу их противоречия публичному порядку России, см. например, постановление АС Московского округа от 17.02.2026 № Ф05-17716/2025 по делу № А40-231664/2023:

> *«Санкции, в том числе, принятые и примененные в отношении истца и третьего лица, являются нормами публичного права США и Европейского Союза, то есть представляют собой предписания иностранных властных органов о наложении ряда публично-правовых ограничений прав и обязанностей частных лиц.*
>
> *Публичное право не обладает экстерриториальным характером, а потому санкционное законодательство США, Соединенного Королевства Великобритании и*

*Северной Ирландии, а также Европейского Союза не порождает прав и не налагает обязанностей на российских граждан и юридических лиц, что соответствует фундаментальным принципам о недопустимости вмешательства во внутренние дела государств и суверенитета государств (Декларация о недопустимости вмешательства во внутренние дела государств, об ограждении их независимости и суверенитета, принята на Генеральной Ассамблее ООН резолюцией 2131 (XX) от 21.12.1965).*

*Таким образом, экономические санкции иностранного государства не могут являться основанием для нарушения прав лица, в том числе посредством одностороннего отказа от договоров, поскольку экономические санкции противоречат публичному порядку Российской Федерации и не подлежат применению на ее территории в силу прямого указания закона».*

Таким образом, такое основание для отказа от договора, как включение контрагента в санкционные списки иностранного государства, на территории РФ является незаконным, а заявленный на этом основании отказ является недействительным.

Согласно ст. 308.3 ГК РФ, в случае неисполнения должником обязательства кредитор вправе требовать по суду исполнения обязательства в натуре, если иное не предусмотрено законом или договором либо не вытекает из существа обязательства. Суд по требованию кредитора вправе присудить в его пользу денежную сумму на случай неисполнения указанного судебного акта в размере, определяемом судом на основе принципов справедливости, соразмерности и недопустимости извлечения выгоды из незаконного или недобросовестного поведения.

Из-за недобросовестных действий Ответчиков Истец претерпевает существенные негативные последствия, не может полноценно вести свою хозяйственную деятельность и получать прибыль.

Истец отмечает, что неправомерные действия Ответчиков по удалению Приложений из магазина App Store повлекли невозможность для конечных пользователей скачивать и полноценно пользоваться Приложениями, помимо России, еще в более 40 государствах (включая Белоруссию, Азербайджан, Армению, Казахстан, Кыргызстан, Молдову, Таджикистан, Узбекистан, Грузию, Египет, Индонезию, Малайзию, Таиланд, Турцию, Туркменистан, Вьетнам, ОАЭ, Кубу, Лаос, Камбоджу, Афганистан, Боливию, Республику Конго, Колумбию, Гренаду, Гамбию, Индию, Ирак, Сент-Китс и Невис, Кувейт, Мьянму, Никарагуа, Пакистан, Катар, Саудовскую Аравию, Венесуэлу, ЮАР и Танзанию), что также подтверждает абсолютную безосновательность одностороннего отказа от Лицензионного соглашения.

**В связи с этим, Истец просит суд установить судебную неустойку** за каждый день неисполнения судебного акта в отношении каждого из Приложений, начиная с шестого дня с даты изготовления решения в полном объеме и до его фактического исполнения в следующих размерах:

**VK:** social network, messenger (Apple ID 564177498) – в размере 50 000 000 (Пятьдесят миллионов) руб. за каждый день неисполнения судебного акта;

**Odnoklassniki:** Social network (Apple ID 398465290) – в размере 3 000 000 (Три миллиона) руб. за каждый день неисполнения судебного акта;

**VK Music:** playlists & podcasts (Apple ID 1054372220) – в размере 5 000 000 (Пять миллионов) руб. за каждый день неисполнения судебного акта.

Суд не вправе отказать в присуждении судебной неустойки в случае удовлетворения иска о понуждении к исполнению обязательства в натуре (п. 31 Постановления Пленума ВС РФ от 24.03.2016 № 7 «О применении судами некоторых положений Гражданского кодекса Российской Федерации об ответственности за нарушение обязательств»).

**7. Ходатайство об обращении судебного решения к немедленному исполнению.**

Согласно ст. 182 АПК РФ, арбитражный суд по заявлению истца вправе обратить решение к немедленному исполнению, если вследствие особых обстоятельств замедление его исполнения может привести к значительному ущербу для взыскателя или сделать исполнение невозможным.

Как упоминалось ранее, VK — крупнейшая по числу пользователей российская технологическая компания. Пользователи сервисов VK составляют 97% месячной аудитории Рунета (российского сегмента сети «Интернет»), то есть практически все интернет-пользователи России — пользователи продуктов компании.

Социальные сети ВКонтакте и Одноклассники входят в Перечень отечественных социально значимых информационных ресурсов, доступ к которым должен обеспечиваться операторами связи в силу ФЗ от 07.07.2003 № 126-ФЗ «О связи» (см. Приказ Минкомсвязи России от 31.03.2020 № 148 (ред. от 01.07.2021) «О проведении эксперимента об оказании гражданам на безвозмездной основе услуг связи по передаче данных и по предоставлению доступа к информационно-телекоммуникационной сети "Интернет" на территории Российской Федерации для использования социально значимых информационных ресурсов в информационно-телекоммуникационной сети "Интернет"»).

Соответственно, Правительством РФ подтвержден социально значимый статус Приложений, доступность и функциональность которых должна поддерживаться в приоритетном порядке.

Таким образом, немедленное восстановление Приложений в магазине Apple Store и восстановление их полного функционала (в частности, мгновенных уведомлений о входящих звонках и сообщениях) необходимо не только в интересах Истцов, но и в публичных интересах.

Руководствуясь ст.ст. 168, 309, 308.3, 310, 1193, 1211 ГК РФ, ст.ст. 125, 126, 247 АПК РФ, ООО «ВК»

**ПРОСИТ АРБИТРАЖНЫЙ СУД:**

**1.** Признать недействительным односторонний отказ компаний **Apple Inc.** (регистрационный номер 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (регистрационный номер 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE) и **ООО «ЭППЛ РУС»** (ИНН 7707767220, ОГРН 5117746070019, 125009, г. Москва, пер. Романов, д. 4, стр. 2, эт. 6 пом ii ком 54) от исполнения заключенного с **ООО «ВК»** (ИНН 7743001840, ОГРН 1027739850962, 125167, г. Москва, пр-кт Ленинградский, д. 39, стр. 79) Лицензионного соглашения об использовании Apple Developer Program, учетная запись пользователя «VK LLC» (ID: 4D6LA585PP).

**2.** Обязать солидарных ответчиков – компании **Apple Inc.** (регистрационный номер 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd**. (регистрационный номер 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE) и **ООО «ЭППЛ РУС»** (ИНН 7707767220, ОГРН 5117746070019, 125009, г. Москва, пер. Романов, д. 4, стр. 2, эт. 6 пом ii ком 54) восстановить в полном объеме доступ **ООО «ВК»** (ИНН 7743001840, ОГРН 1027739850962, 125167, г. Москва, пр-кт Ленинградский, д. 39, стр. 79) к веб-платформам Apple Developer Program и App Store Connect под учетной записью пользователя «VK LLC» (ID: 4D6LA585PP).

**3.** Обязать солидарных ответчиков – компании **Apple Inc.** (регистрационный номер 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (регистрационный номер 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23

YK84, IE) и **ООО «ЭППЛ РУС»** (ИНН 7707767220, ОГРН 5117746070019, 125009, г. Москва, пер. Романов, д. 4, стр. 2, эт. 6 пом ii ком 54) восстановить зарегистрированные за ООО «ВК» под учетной записью пользователя «VK LLC» (ID: 4D6LA585PP) следующие приложения в магазине приложений App Store в том виде, в котором они существовали до неправомерного удаления, с сохранением всех свойств, характеристик и функционала на условиях Лицензионного соглашения об использовании Apple Developer Program:

**VK:** social network, messenger (Apple ID 564177498);
**Odnoklassniki:** Social network (Apple ID 398465290);
**VK Music:** playlists & podcasts (Apple ID 1054372220).

**4.** Обязать солидарных ответчиков - компании **Apple Inc.** (регистрационный номер 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (регистрационный номер 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE) и **ООО «ЭППЛ РУС»** (ИНН 7707767220, ОГРН 5117746070019, 125009, г. Москва, пер. Романов, д. 4, стр. 2, эт. 6 пом ii ком 54) восстановить полный функционал (включая передачу push-уведомлений) зарегистрированных за ООО «ВК» под учетной записью пользователя «VK LLC» (ID: 4D6LA585PP) следующих приложений, установленных на устройствах пользователей до их неправомерного удаления из магазина приложений App Store, на условиях Лицензионного соглашения об использовании Apple Developer Program:

**VK:** social network, messenger (Apple ID 564177498);
**Odnoklassniki:** Social network (Apple ID 398465290);
**VK Music:** playlists & podcasts (Apple ID 1054372220).

**5.** Обратить решение к немедленному исполнению.

**6.** В случае неисполнения решения суда в течение пяти дней с даты изготовления судебного акта в полном объеме взыскать солидарно с компаний **Apple Inc.** (регистрационный номер 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (регистрационный номер 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE) и **ООО «ЭППЛ РУС»** (ИНН 7707767220, ОГРН 5117746070019, 125009, г. Москва, пер. Романов, д. 4, стр. 2, эт. 6 пом ii ком 54) в пользу **ООО «ВК»** (ИНН 7743001840, ОГРН 1027739850962, 125167, г. Москва, пр-кт Ленинградский, д. 39, стр. 79) судебную неустойку в отношении каждого из приложений за каждый день неисполнения судебного акта, начиная с шестого дня с даты изготовления судебного акта в полном объеме и до его фактического исполнения в следующих размерах:

**VK:** social network, messenger (Apple ID 564177498) – в размере 50 000 000 (Пятьдесят миллионов) руб. за каждый день неисполнения судебного акта;
**Odnoklassniki:** Social network (Apple ID 398465290) – в размере 3 000 000 (Три миллиона) руб. за каждый день неисполнения судебного акта;
**VK Music:** playlists & podcasts (Apple ID 1054372220) – в размере 5 000 000 (Пять миллионов) руб. за каждый день неисполнения судебного акта.

**7.** Взыскать с компаний **Apple Inc.** (регистрационный номер 806592, One Apple Park Way, Cupertino, California, 95014, USA), **Apple Distribution International Ltd.** (регистрационный номер 470672, Hollyhill Industrial Estate, Hollyhill, Cork, Republic of Ireland, T23 YK84, IE) и **ООО «ЭППЛ РУС»** (ИНН 7707767220, ОГРН 5117746070019, 125009, г. Москва, пер. Романов, д. 4, стр. 2, эт. 6 пом ii ком 54) в пользу **ООО «ВК»** (ИНН 7743001840, ОГРН 1027739850962, 125167, г. Москва, пр-кт Ленинградский, д. 39, стр. 79) расходы по уплате государственной пошлины в размере 200 000,00 руб.

**Приложение (надлежащим образом заверенные копии, если не указано иного):**

1. Выдержки из годового отчета VK за 2025 год.
2. Лицензионное соглашение об использовании Apple Developer Program.
3. Нотариальный протокол осмотра личного кабинета VK LLC.
4. Описание прав и обязанностей сторон Лицензионного соглашения.
5. Пресс-релиз VK от 25.06.2026.
6. Публикация РБК «Apple объяснила удаление приложений VK из App Store» от 25.06.2026.
7. Схема владения ООО «ВК» (сведения из СПАРК-Интерфакс).
8. Регламент Совета ЕС № 2026/1708 от 13.07.2026 (с переводом на русский язык и нотариальным заверением подлинности подписи переводчика).
9. Выписка из Государственного реестра аккредитованных филиалов, представительств иностранных юридических лиц в отношении представительства компании «Эппл Дистрибьюшн Интернэшнл Лимитед» в городе Москве.
10. Выписка их ЕГРЮЛ в отношении ООО «ЭППЛ РУС».
11. Бухгалтерская отчетность ООО «ЭППЛ РУС» за 2025 год вместе с пояснениями (из ресурса БФО).
12. Решение американского суда (Северного округа штата Калифорния) от 27.01.2025 по делу № 5:25-cv-00851 (с переводом на русский язык и нотариальным заверением подлинности подписи переводчика).
13. Определения АСгМ от 30.01.2025 и 25.04.2025 по делу № А40-126705/2022 и судебные акты вышестоящих инстанций по данному обособленному спору, судебные акты по делам №№ А40-24249/2025, А40-189091/2025.
14. Выписка из ЕГРЮЛ в отношении Истца.
15. Выписка из ЕГРЮЛ в отношении ООО «Управляющая компания ВК».
16. Выписка из реестра в отношении Apple Inc. (с переводом на русский язык и нотариальным заверением подлинности подписи переводчика).
17. Выписка из реестра в отношении Apple Distribution International Ltd. (с переводом на русский язык и нотариальным заверением подлинности подписи переводчика).
18. Доказательства направления искового заявления с приложениями в адреса лиц, участвующих в деле.
19. Доказательство уплаты государственной пошлины.
20. Доверенность на представителя.
21. Диплом о высшем юридическом образовании представителя.

Представитель ООО «ВК»
по доверенности

Христофоров А.А.