FILED
Oct 20 2026
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

APPLE INC.,

Plaintiff,

v.

VK LLC,

Defendant.

CASE NO.

**DECLARATION OF KONSTANTIN KROLL IN SUPPORT OF APPLE INC.'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

# DECLARATION OF KONSTANTIN KROLL

Pursuant to 28 U.S.C. § 1746, I, Konstantin Kroll, declare as follows:

## BACKGROUND AND QUALIFICATIONS

1. I am a partner at Dentons Europe LLP, One Fleet Place, London EC4P 4GD, UK. I am a Russian-qualified advocate, a solicitor of the Senior Courts of England and Wales and an Irish solicitor (non-practising). I have over 29 years of transactional and regulatory experience in the Russian market.

2. Until the end of 2022, I was based in Dentons' Moscow office leading Dentons' Russian Corporate and M&A practice. Since 1 January 2023, I relocated to the London office of the firm where I continue advising on various Russian law matters, with a particular emphasis on Russian regulatory and counter-sanctions measures and advising international companies on their exits from the Russian market. Prior to joining Dentons, I was a partner at leading international law firms Orrick, Jones Day and Allen & Overy based in these firms' respective Moscow offices since 1997. In Russia, I have been involved in numerous finance and corporate transactions in virtually all sectors of the Russian economy, and I have extensive experience advising on Russian law and regulatory matters. I have experience in applying for various regulatory approvals in Russia, including, inter alia, the Central Bank, the Federal Anti-Monopoly Service and the Government Commission for Strategic Investments. I have been involved in the working groups developing new legislation under the auspices of the State Duma (the lower chamber of the Russian parliament) and market participants' organizations such as, the Association of Russian Banks. I have advised clients and spoken publicly on the subject of Russian courts' ability to assume jurisdiction over disputes involving sanctioned entities on numerous occasions.

3. I am a fellow (FCIArb) of the Chartered Institute of Arbitrators (CIArb) and a Vice President of the Russian Chapter of CIArb European Branch, and I am a member/accredited arbitrator at over twenty leading international arbitral institutions/centers. I am a member of the Academic Council of Russia's Higher School of Economics Master's Program "International Private Law and International Commercial Arbitration" and a visiting lecturer at the Higher School of Economics (University) in Moscow; previously I was also a visiting lecturer at the Moscow State University, the

All-Russia Academy of Foreign Trade and the Russian Presidential Academy of National Economy and Public Administration (joint program with the University of London). My curriculum vitae is attached as **Exhibit A**.

4. My mother tongue is Russian, however, I have a good command of English which has allowed me to examine original documents in English and Russian (as applicable) and to prepare this Declaration in English. Given the urgent nature of the application, I have been asked to prepare this report within a relatively short time frame. I have therefore identified certain sources of Russian law (including statutes and court judgments) that I believe are relevant and instructive given the circumstances of this case, and have focused on explaining their relevance and implications in the context of this case. I have not attached the underlying sources but am ready to provide copies and English translations thereof promptly upon request, if that would be helpful for the Court.

ASSIGNMENT

5. I understand that, earlier this year, Plaintiff Apple Inc. ("Apple") suspended Defendant VK LLC's ("VK") developer account, and VK's applications were removed from the App Store, on account of Apple's compliance obligations under sanctions laws; that VK's relationship with Apple and participation in, and distribution of apps through, the App Store were governed by a contract that requires any disputes arising from that contract and/or VK's relationship with Apple to be resolved in a forum specified by that contract; and that VK has commenced an action against Apple and two of its affiliates in Russian court instead (Case No. A40-250513/26-12-2188), seeking the restoration of VK's application to the App Store and reinstatement of VK's developer accounts, among other relief. Should full access to the App Store not be restored by Apple, VK is asking the Russian court to impose a court penalty (*astreinte*) in the amount of the Ruble equivalent of approximately $700,000 per day, payable by Apple and its affiliates on a joint and several liability basis.

6. I have been asked to provide expert evidence relevant to Apple's Application for an *Ex Parte* Temporary Restraining Order and Order to Show Cause based on my knowledge of Russian law and my experience with Russian courts. In preparing this declaration, I have reviewed and relied on the complaint filed by VK in Russia and Annex 13 to that complaint, the Russian court order accepting

the complaint, as well as relevant Russian law (to include the doctrine of Russian law, Russian statutes and case law).

SUMMARY OF OPINION

7. Based on current Russian court practice, in my opinion, if Apple were to provide VK with notice of any filing in this action, VK would be able to apply for interim measures in the form of an anti-suit injunctive order quickly, without notice to Apple, and obtain such relief from a Russian court promptly, on an *ex parte* basis, and practically speaking, within a matter of days.

8. Based on recent practice of Russian courts, in my opinion, a Russian court would most likely issue any such anti-suit injunctive relief under threat of a coercive penalty which, as described in detail below, would be uncapped and may reach substantial, potentially astronomic amounts in the event of a violation of the anti-suit order.

OPINION

9. By way of background, in the Russian judicial system, Arbitrazh (state commercial) courts are charged with adjudicating commercial disputes, including cross-border disputes with foreign parties. The procedural rules for the Arbitrazh courts are set out in the Arbitrazh Procedure Code of the Russian Federation ("APC" or "APC RF").

10. While Russian law has always envisaged exclusive jurisdiction of Russian courts in relation to certain types of disputes (e.g., disputes relating to title to real estate, and certain other instances), before 2020, there were no specific provisions relating to sanctions-related disputes (i.e., disputes involving a Russian party under foreign sanctions and/or arising from actions taken in connection with Russia-related sanctions).

11. APC Article 247 sets out a non-exhaustive list of grounds for an Arbitrazh Court to exercise jurisdiction over commercial disputes involving foreign parties (unrelated to sanctions). Pursuant to APC Article 247, Russian Arbitrazh courts shall have jurisdiction over a dispute involving a foreign (non-Russian) party, including, inter alia, if a management body, branch or representative office of a foreign party is located in the territory of the Russian Federation (sub-section 1(2) of Article 247 APC), if the dispute has arisen from a contract which allegedly was due to be performed, or was performed, in the territory of the Russian Federation (sub-section 1(3) of Article 247 APC), if the claim

purportedly caused damages in the territory of the Russian Federation (sub-section 1(4) of Article 247 APC), and in other circumstances where the underlying legal relationship is "closely connected" with the Russian Federation (sub-section 1(10) of Article 247 APC).

12. APC Article 247 does not, however, apply if the parties have a valid and enforceable forum-selection clause in their contract, as explained in more detail below. Modern Russian law recognizes the ability of parties to opt into the jurisdiction and forum of a foreign court (subject to exceptions, as noted in paragraph 10 above, not applicable here) by contract – a "prorogation" agreement.[1] APC Article 252 requires Russian Arbitrazh courts to dismiss proceedings if a party refers to an applicable prorogation agreement, unless the court establishes that such prorogation agreement is invalid, unenforceable, or interferes with the exclusive jurisdiction of Russian courts.[2] So historically Russian courts routinely enforced foreign forum-selection clauses (prorogation agreements) that required any disputes between the parties to be adjudicated in foreign tribunals.

13. Importantly, prior to 2020 the concept of an "anti-suit injunction" did not exist in Russian law.

14. In June 2020, in response to foreign sanctions issued against Russian entities, the Russian Federation enacted amendments[3] to the APC introducing new APC Articles 248.1 and 248.2 granting Russian Arbitrazh courts exclusive[4] jurisdiction over disputes (a) involving a party (or parties) subject to Russia-related sanctions, and/or (b) arising from Russia-related sanctions implemented by a foreign authority. The APC amendments permit a claimant to sue in the Russian Arbitrazh courts, even if the dispute falls within the scope of a forum-selection clause in the parties' contract, if the claimant

---

[1] A prorogation agreement is a civil law term equivalent to a "forum-selection" clause in common law jurisdictions.

[2] This position has been expressly confirmed by the Russian Supreme Court in its Plenum's Regulation No. 23 dated June 27, 2017 on economic disputes with foreign element.

[3] The APC amendments are often referred to as the "Lugovoi Law" after Mr. Andrei Lugovoi, one of the deputies of the State Duma, the lower chamber of the Russian Parliament, who introduced the law.

[4] This "exclusivity" does not limit a Russian party's ability to agree to a foreign court's jurisdiction should it desire to do so. Rather, it applies only in scenarios where there is no valid contractual jurisdiction choice, or where a sanctions-affected Russian party does not want to honor its contractual forum-selection obligation.

seeks to avoid litigation or arbitration in the contractually-selected jurisdiction due to Russia-related sanctions in effect in that jurisdiction (or uses such foreign sanctions as an excuse) (APC Article 248.1). The amendments also enable the Russian Arbitrazh courts (i) to grant anti-suit injunctions preventing a foreign party from pursuing proceedings in a foreign forum, and (ii) in the event of the foreign party's non-compliance, to assess penalties of up to the full amount of damages sought in the foreign forum in question, plus the Russian claimant's costs (APC Article 248.2).

15. A penalty for non-compliance with an anti-suit injunction under APC Article 248.2 is a type of coercive court penalty (*astreinte*).[5] The concept of *astreinte* was introduced in the Russian Civil Code (the "Civil Code" or "CC") in 2015.[6] Under CC Article 308.3, the amount of the penalty is determined by the court in its discretion—guided by principles of justice, proportionality, and the impermissibility of profiting from unlawful or bad faith conduct—and is not subject to any cap. Under APC Article 248.2, section 10, the *astreinte* is capped by the quantum of damages at issue in the foreign-court proceedings, plus the Russian claimant's costs.

16. As I discuss further below, because an *astreinte* under APC Article 248.2 is capped and an *astreinte* under CC Article 308.3 is not capped, an increasingly common trend in Russian litigation is for Russian plaintiffs to strategically avoid referencing Article 248.2. Instead, Russian plaintiffs often rely on alternative grounds to seek an *astreinte* that is uncapped under CC Article 308.3 when seeking penalties for alleged violations of a Russian court anti-suit injunction that purports to enjoin a foreign party from pursuing proceedings in a foreign forum.

17. After Russia commenced in February 2022 a so-called "special military operation" in Ukraine, which is internationally perceived as the "invasion" of Ukraine, the European Union, the United Kingdom, the United States, and other jurisdictions expanded the scope of their sanctions regimes against Russian entities. In response to these expanded sanctions, hundreds of Russian

---

[5] The coercive penalty (*astreinte*) is not a substitute for damages. It is an instrument to force the defendant to comply with a judicial order. The *astreinte* is thus payable on top of any damages the court may grant the claimant.

[6] The Civil Code does not refer to "*astreinte*" as the term as such. It does however recognise the concept itself in Article 308.3, and then in academic publications, legal commentaries and textbooks, and the legal profession generally this concept is referred to as the *astreinte*.

plaintiffs/claimants have utilized APC Articles 248.1 and 248.2 to file suits in the Russian Arbitrazh courts against Western respondents/defendants, notwithstanding their preexisting contractual commitments to resolve such disputes in foreign courts or tribunals.[7] A notable example is *Tsargrad v Google* (Case No. A40-155367/2020) (directly quoted and relied upon in VK's complaint), in which Russian TV channel Tsargrad sued Google in Russian court demanding restoration of its channel on YouTube, which had been removed on account of U.S. sanctions against Tsargrad. Despite Google's objections to forum based on Tsargrad's contractual agreement for any disputes to be subject to the exclusive jurisdiction of foreign courts, the Moscow Arbitrazh Court assumed jurisdiction pursuant to APC Article 248.1, ruled in favour of Tsargrad, and (citing CC Article 308.3) imposed a coercive penalty (*astreinte*) accruing daily against Google for non-compliance, initially at a rate of RUB 100,000 per day, with that rate doubling every seven days. Notably, the Russian court and judge ruling against Google in favour of Tsargrad were the same as in the proceedings brought by VK against Apple (Moscow Arbitrazh Court and Judge A.S. Chadov, respectively). The same *astreinte* was imposed against Google in two other, highly similar Russian cases[8] – arising from its removal of two other Russian media companies' channels for sanctions reasons and, again, despite Google's forum objections – after Google did not comply with the Russian court's order to reinstate their channels.

---

[7] For example, *RusChemAlliance v Linde GmbH, Linde PLC* (Case No. A56-13299/2024; total penalty/astreinte in excess of EUR 1 billion (with a daily accruing component)); *RusChemAlliance v Deutsche Bank AG* (Case No. A56-90971/2024; penalty/astreinte of EUR 238.1 million); *RusChemAlliance v Landesbank Baden-Württemberg* (Case No. A56-90984/2024; penalty/astreinte of EUR 52 million); *Transneft v Magomedov* (Case No. A40-17658/2024; penalty/astreinte of USD 2.5 billion); *Transneft v Port-Petrovsk* (Case No. A40-23676/24; penalty/astreinte of USD 5 billion); *Gazprom Export v OMV Gas Marketing & Trading* (Case No. A56-40648/2024; penalty/astreinte of EUR 575.3 million); *Gazprom Export v Innogy Energie* (Case No. A56-45782/2024; penalty/astreinte of EUR 78.2 million); *Gazprom Export v Engie S.A.* (Case No. A56-45784/2024; penalty/astreinte of EUR 304.7 million); *Khlodvig Enterprises v Renaissance Securities (Cyprus) et al.* (Case No. A21-16114/2024; cumulative penalty/astreinte of USD 18.9 million); *GEKOLINA v Renaissance Securities (Cyprus) et al.* (Case No. A40-310713/24; cumulative penalty/astreinte of USD 75.32 million); *Malofeev v Twitch Interactive and Amazon.com* (Case No. A40-177629/25; penalty/astreinte of USD 1 million per infraction); *TKB Bank, Absolut Bank, Chelindbank and YK Alfa-Capital v J.P. Morgan SE* (Case No. A40-366254/25; penalty/astreinte of RUR 100,000 daily (doubling every fortnight) and a one-time astreinte of EUR 67.7 million), among other relevant cases.

[8] Case No. A40-211341/2022 and Case No. A40-99830/2022.

Collectively, these three penalties have ballooned to US$20 decillion—an astronomical sum exceeding the estimated combined GDP of all global economies many times over.

18. As explained above, in addition to permitting suit in Russian Arbitrazh courts, the Lugovoi Law also enabled any sanctioned Russian entity to seek an anti-suit injunction prohibiting its counterparty from commencing suit in another forum, even if it is the contractual choice of forum in the parties' agreement. Specifically, Article 248.2 of the APC provides that a Russian party like VK, which is subject to foreign sanctions, may seek an anti-suit injunction from a Russian court if foreign proceedings have been initiated against it, or if there is evidence suggesting that such proceedings will be initiated. Importantly, the mere fact that the foreign proceedings have been or will be filed in a jurisdiction that has implemented Russia-related sanctions would suffice, from a Russian court's perspective, to justify issuing an anti-suit injunction.[9]

19. In my opinion, if Apple were to provide VK with notice that it intended to file an action in federal court in California and to apply for a temporary restraining order preventing VK from continuing to litigate in Russia, that notice would be sufficient evidence for VK to seek and obtain an anti-suit injunction against Apple from a Russian Arbitrazh court under Article 248.2 of the APC, and, in the interim, for *ex parte* relief under Article 93 of the APC (see below).

20. If VK applies for an anti-suit injunction under APC Article 248.2, the final court ruling could take as little as a couple of weeks[10] or up to a few months to issue. Importantly, however, VK would also be able to seek provisional injunctive relief (similar to a U.S.-law temporary restraining order (TRO) or preliminary injunction (PI)) immediately pursuant to APC Article 93. Article 93, Section 1.1, of the APC states that a Russian court must consider an application for injunctive relief no

---

[9] Initially, Russian courts often expected the sanctioned Russian party to prove that its access to justice in a foreign jurisdiction was limited, but this practice changed after the Russian Supreme Court held, in *Uraltransmash v PESA* (Case No. A60-36897/2020), that mere imposition of sanctions by a foreign state suffices to assume sanctioned parties' lack of access to justice in that jurisdiction. This position has been reinforced in the Russian Supreme Court's Review No. 8 (2026) of 17 June 2026.

[10] For example, in *Gazprom Export v EUROPOL Gaz* (Case No. A56-96787/2023), the Russian claimant applied for an order under APC Article 248.2 requiring EUROPOL GAZ to discontinue arbitration initiated by it in the SCC Arbitration Institute pursuant to the parties' contractual arbitration clause on October 10, 2023, and the Arbitrazh Court announced its ruling, granting injunctive relief in favour of Gazprom Export, on October 26, 2023 (i.e. within 13 business days).

later than the next day after the date of receipt of the application by the court without notifying the parties. The injunctive relief could then be granted by the Russian court in the form of an order prohibiting Apple from taking "certain actions relating to the subject matter of the dispute" (APC Article 91, Section 1(2)).[11] In this regard it is also worth mentioning that APC Article 90, Section 2, explicitly states that injunctive relief is allowed at any stage of the proceedings (a) if not granting such relief may impede or make impossible enforcement of a judicial order, including when enforcement outside Russia is contemplated, and (b) in order to prevent material damages to the claimant. In other words, the Russian Arbitrazh court could grant an anti-suit injunction on the basis of APC Articles 90, 91 and 93 without necessarily referring to, and before issuing a final ruling under, APC Article 248.2.[12] Such injunctive relief may be granted by the Arbitrazh Court on an *ex parte* basis, without notice to Apple and without any opportunity for Apple to assert any objections or defenses to the injunction.

21. Accordingly, it is my opinion that if Apple were to provide VK with notice of its filing of this action and/or of Apple's application for a temporary restraining order, VK would be able to apply for interim measures in the form of anti-suit injunctive relief quickly, without notice to Apple, and obtain such relief from a Russian Arbitrazh court promptly and on an *ex parte* basis, and in theory as soon as within 24 hours (and in practice within a matter of days).[13]

---

[11] Importantly, APC Article 91 does not provide an exhaustive list of available injunctive relief/interim measures and explicitly states in the concluding paragraph of its Section 1 that the Arbitrazh Court may grant "other" injunctive relief/interim measures.

[12] In fact, in *Adorabella v Renaissance Securities, et al.* (Case No. A21-15198/2024), the Arbitrazh Court explicitly stated that, given its pre-emptive purpose, an anti-suit injunction under APC Article 248.2 is only useful while the foreign proceedings are ongoing (or have not started) and would therefore lose its purpose if, by the time the Russian court considers the merits of and grants a request for anti-suit relief under APC Article 248.2, the foreign proceedings have concluded. Thus, the Arbitrazh Court explained, granting interim injunctive relief pursuant to APC Articles 91 and 93 is justified.

[13] For example, in *VTB Bank v VTB Bank (Europe) SE*, the Russian claimant asked the Arbitrazh Court for injunctive relief restraining the defendant from initiating or continuing litigation/arbitration in Hong Kong (as required by the parties' forum selection clause) on October 26, 2023, and the Arbitrazh Court granted an injunction on October 30, 2023, on an *ex parte* basis (ultimately assessing a EUR 112,634,610 penalty for non-compliance); similarly, in *Adorabella v Renaissance Securities, et al.* (Case No. A21-15198/2024), an order restraining the defendants from initiating or continuing litigation in English courts, as required by the parties' forum selection agreement, was requested by the Russian claimant on November 26, 2024, and granted by the Arbitrazh Court on an *ex parte* basis on November 29, 2024 (ultimately leading to a USD 33,280,000 penalty for non-compliance).

22. Based on the current practice of Russian Arbitrazh courts, it is my view that VK would almost certainly succeed in its application. If that were to happen, the consequences would be as follows: Apple would become obligated to comply with that injunction immediately as a matter of Russian law, and if Apple then continued pursuing its action in the United States, it would be subject to fines and other, potentially uncapped penalties, plus VK's costs.[14] Furthermore, there would also be a risk of individual criminal charges, as Article 315 of the Russian Criminal Code provides for criminal liability of managers of a commercial entity wilfully[15] failing to enforce, or preventing enforcement of, a Russian court judgment, or "other court acts" with a maximum punishment of imprisonment for up to 2 years.[16]

23. In recent years, Russian parties have sought and obtained these types of *ex parte* anti-suit injunctions, typically as broad in scope as requested, on numerous occasions. For instance, having reviewed the Russian Arbitrazh court decisions appended as Annex 13 to VK's complaint,[17] these are examples of Russian cases in which Russian parties have been able to obtain anti-suit injunctive relief under the Lugovoi Law and/or the provisions authorizing orders granting provisional injunctive relief under Articles 90-97 of the APC, including on an *ex parte* basis. As another example, in *PJSC VTB v VTB Europe SE* (Case No. A56-103943/2023), a Russian Arbitrazh court granted VTB an anti-suit injunction on an *ex parte* basis pursuant to Article 248.2 after foreign arbitration proceedings had been commenced against VTB in Hong Kong. In another notable example, in *RusChemAlliance v UniCredit*

[14] This remedy is specifically provided for in APC Article 248.2. Russian courts have applied such penalties on numerous occasions, including, for example, in *Sovfrakht v Prosperity Estate* (Case No. A40-156736/2020) (imposing GBP 190,991 penalty), *Tumenneftegaz v First National Petroleum Corporation* (Case No. A70-26488/2022) (imposing USD 148,199,853 penalty) and *Renaissance Securities v Chlodwig* (Case No. A21-16114/2024) (imposing USD 18,900,000 penalty).

[15] This refers to willful and persistent non-compliance, i.e., where a corporate officer has failed to comply with, or act in accordance with, a court judgment, while having the ability to do so, and despite having been duly notified of the need to perform by the bailiffs on multiple occasions.

[16] The duty of an officer of a foreign company to comply with applicable foreign-law obligations (e.g., sanctions laws) should in theory offer credible grounds for a defense, or at least as mitigation for any penalty that might be imposed. Still, I perceive this to be a real potential risk, as foreign sanctions are deemed contrary to Russian public policy and invalid as a matter of Russian law, and given the lack of established court practice.

[17] *ANO TV-Novosti v Google Ireland Ltd.* (Case No. A40-24249/2025); *Google LLC v Google Ireland Ltd.* (Case No. A40-189091/2025); Bankruptcy Case No. A40-126705/2022.

(Case No. A56-90977/2024), after UniCredit obtained an English-court anti-suit injunction against the Russian claimant in *UniCredit v RusChemAlliance* [2024] UKSC 30, a Russian Arbitrazh court ordered UniCredit to procure from the English court revocation of that previously-granted anti-suit injunction and to discontinue all non-Russian proceedings (including any anti-suit injunction requests) under the threat of penalty, in case of non-compliance, in an amount of EUR 250 million. Following the Russian court's grant of that substantial *astreinte*, UniCredit petitioned the English court to dissolve the anti-suit injunction it had entered earlier; RusChemAlliance's claim in the Russian litigation was then settled, reportedly for approximately EUR 460 million.

24. Widespread application of Articles 248.1 and 248.2 of the APC RF by Russian courts has accelerated since 2022 (before that only a handful of cases applied these articles). That did not go unnoticed in the jurisdictions that have implemented Russia-related sanctions. The EU, for example, has introduced various sanctions packages aimed at neutralizing the ability of Russian parties to enforce Russian court judgments obtained by taking advantage of these Lugovoi Law provisions of the APC.[18]

25. Recent Russian court practice indicates that, in view of this backlash, Russian parties have recently developed a new procedural strategy whereby they do not specifically refer to Articles 248.1 and 248.2 of the APC RF in their Russian court claim—evidently to avoid the EU's bar on enforcement or recognition of judgments obtained under these provisions and to mitigate the risk of falling under EU sanctions due to pursuing litigation in Russia in reliance on the Lugovoi Law. This

---

[18] The EU's response has developed over the course of multiple steps, including, *inter alia*:

- The 14th sanctions package (June 2024) introduced Article 11a of Regulation 833/2014, creating a damages remedy for EU operators suffering loss as a consequence of certain claims brought in third-country courts in connection with contracts or transactions affected by EU sanctions. The same package also introduced a transaction ban targeting listed persons and entities that resort to Articles 248.1 or 248.2 in sanctions-affected disputes.
- The 15th sanctions package (December 2024) introduced Article 11c. It prevents EU Member States from recognising, giving effect to or enforcing Russian orders, judgments and other relief pursuant to, or derived from, Articles 248.1 and 248.2 or equivalent Russian legislation.
- The 20th sanctions package (April 2026) added Article 11ca. It gives protected EU persons a basis for seeking an order from a competent EU Member State court upholding an exclusive jurisdiction or arbitration clause and requiring the Russian claimant not to initiate, or to discontinue, specified Russian proceedings. The package also strengthened protection against attempts to export the effects of Russian measures into third countries.

strategy also allows Russian parties to ask, in the event of the opposing party's non-compliance with an anti-suit injunction ordered by the Russian court, for penalties (*astreinte*) not subject to the cap imposed by APC Article 248.2 (as discussed above).

26. Russian parties now tend to (a) base their claims against foreign parties on the more generic (i.e., not sanctions-related) provisions of the APC, (b) argue that a contractual prorogation clause referring the underlying dispute to a forum in a jurisdiction which has implemented Russia-related sanctions is invalid or unenforceable as a matter of Russian law and public policy (thus purporting to avoid the consequences of APC Article 252, which would otherwise require the Russian court not to consider a claim that the parties agreed to resolve in a different forum, as discussed above), and (c) ask the Russian court to assume jurisdiction and apply Russian law on the supposed basis that the underlying legal relationship is allegedly most closely connected with Russia (by virtue of APC Article 247, as discussed above).

27. Based on my review of VK's Russian complaint, I believe VK has chosen to implement the above-described strategy in its Russian proceedings against Apple. Russian parties pursuing this alternative strategy tend to argue that (a) Russia-related sanctions form part of the applicable foreign law; (b) as Russian law does not recognise foreign sanctions, applying such foreign law would be contrary to Russian public policy; therefore, (c) the prorogation agreement is invalid and unenforceable in Russia purportedly because it calls for resolving disputes in a court seated in a jurisdiction, which has introduced Russia-related sanctions. Then, a Russian party would typically invoke Article 247 of the APC RF, which is rather broadly drafted and sets out a non-exhaustive list of grounds on which Russian court shall have jurisdiction over a dispute involving a foreign non-Russian party (as discussed above). Last but not the least, if the foreign party seeks to enforce its contractual forum-selection clause in a foreign court or tribunal, the Russian party would then request a coercive penalty (*astreinte*) for non-performance of the Russian court's anti-suit order pursuant to CC Article 308.3. VK's complaint follows this template.

28. Importantly, in recent court practice, Russian courts have referred to other provisions of the APC (including Articles 248.1 and 248.2), even if—as is true of VK's complaint—the claimant has not based its claim on Articles 248.1 and 248.2. Thus, Russian claimants pursuing such strategy seek

the same remedies as made available by APC Articles 248.1 and 248.2 – i.e., asking the Russian court to assume jurisdiction, to disregard the choice of forum and governing law of a foreign jurisdiction that has issued Russia-related sanctions, and to issue injunctive relief under threat of coercive penalty for non-performance (*astreinte*) – without specifically referencing these articles to create an impression that they are pursuing a general claim for damages rather than a claim directly related to Russia-related sanctions and Russian counter-measures. In my experience, this is done to avoid the international repercussions of litigating on the basis of the Lugovoi Law at the judgment enforcement stage, thus facilitating efforts by Russian entities to execute the resulting Russian court judgments on the Western respondents'/defendants' assets globally. This also enables Russian claimants to maximize the value of the coercive penalty for non-compliance with the Russian court's order (*astreinte*) imposed on the foreign party and its Russia-based affiliate(s), since unlike Article 248.2, the amount of the coercive penalty available under other provisions (e.g., CC Article 308.3 or APC Article 174) is not capped by the quantum of damages and the claimant's costs.[19] As VK seeks to hold Apple and its Russian affiliate jointly and severally liable for the penalty (*astreinte*), the same strategy could expose Apple's Russian affiliate to insolvency.[20]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[19] Pursuant to CC Article 308.3, a creditor may ask the court to grant a coercive penalty payable by the debtor to the creditor in the event that the debtor fails to comply with a court order issued in favour of the creditor. A corresponding provision in APC Article 174, Section 4, enables an Arbitrazh court to grant a claimant a coercive penalty payable by the defendant if the defendant fails to comply with a court order. Under both provisions, the amount of the penalty is determined by the court in its discretion, guided by principles of justice and proportionality and the impermissibility profiting from unlawful or bad faith conduct. Unlike Article 248.2, there is no limit on the amount of the coercive penalty a court may award pursuant to CC Article 308.3 and APC Article 174.

[20] This is exemplified by the Russian bankruptcy proceedings against Google's Russian affiliate, Google LLC, that resulted from the astronomical *astreinte* imposed due to Google's failure to comply with Russian court orders that demanded reinstatement of accounts of sanctioned Russian parties in *Tsargrad* and related proceedings. See Google LLC (represented by the bankruptcy manager) v Google Ireland Ltd. (Case No. A40-189091/25; penalty/astreinte of RUR 65.08 billion (approx. USD 781 million) per infraction).

This declaration was executed in London, United Kingdom, on October 19, 2026.

Konstantin Kroll